*Moira E. Akers v. State of Maryland*, No. 7, September Term, 2024, Opinion by Booth, J.

**RELEVANCY—EVIDENCE OF INTERNET SEARCHES PERTAINING TO ABORTION.** A woman's internet searches about terminating a pregnancy during a period in which she would be able to legally obtain an abortion in this State were irrelevant as a matter of law to show her intent to kill or harm a newborn many months later at birth. The abortion searches were not probative of motive or intent to kill or harm a child. The predicate fact—lawfully contemplating the termination of a pregnancy—does not support the inferences advanced by the State—an intent, plan, or motive to kill or harm a person.

**RELEVANCY—EVIDENCE OF A WOMAN'S LACK OF PRENATAL CARE.** A woman's decision to forgo prenatal care, by itself, was not probative of motive or intent to kill or harm a live child. Women forgo prenatal care for a variety of reasons, and the failure to obtain such care is too speculative, ambiguous, and equivocal to support an inference that she would be more likely to harm a live child or prevent a live child's access to medical care if care was necessary.

**EXCLUSION OF PREJUDICIAL EVIDENCE—PERTAINING TO DISPARATE PRENATAL CARE.** To the extent that the State has argued before this Court for the first time that a woman's *disparate* prenatal care is relevant, given the argument was not raised below, the Court declined to address it.

Circuit Court for Howard County
Case No.: C-13-CR-19-000367
Argued: September 9, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 7

September Term, 2024

MOIRA E. AKERS

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Opinion by Booth, J.
Watts, J., concurs.
Biran and Gould, JJ., dissent.

Filed: February 19, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A woman's right to terminate a pregnancy is one of the most divisive issues in this country. Although abortion is a protected right in Maryland and a common event in many women's lives, it is highly stigmatized. In this case, we must consider whether evidence of a criminal defendant's internet searches on abortion in the early months of her pregnancy was relevant to show her intent to kill or harm her newborn several months later at birth, or, if marginally relevant, unfairly prejudicial.

The State of Maryland charged Petitioner, Moira E. Akers, in the Circuit Court for Howard County with murder and child abuse resulting in the death of her newborn. The charges arose in connection with Ms. Akers' at-home delivery of the baby without her husband's knowledge that she was pregnant at the time. Ms. Akers was the sole witness to the delivery. Ms. Akers maintains that the baby was stillborn, and the State contends that the baby died of asphyxiation at Ms. Akers' hands.

A jury convicted Ms. Akers of second-degree murder and child abuse resulting in death. The trial court sentenced Ms. Akers to 30 years of imprisonment for murder and a concurrent 20 years of imprisonment for child abuse resulting in death. The Appellate Court of Maryland affirmed in an unreported decision.

This Court granted *certiorari* to determine whether evidence of Ms. Akers' internet searches about terminating a pregnancy during a period in which she would be able to legally obtain an abortion in this State and her decision to forgo prenatal care are irrelevant to an intent to kill or harm a newborn at birth, or, if marginally relevant, unfairly prejudicial.

We hold that the internet searches are irrelevant and that the trial court erred as a matter of law in admitting them. We similarly hold that Ms. Akers' bare decision to forgo

prenatal care was not probative of motive or an intent to kill or harm a live child. To the extent that the State has asserted that evidence of *disparate* prenatal care was relevant, given that this argument is being raised for the first time before this Court, we decline to address it. In light of our holding on the inadmissibility of the abortion searches, we reverse the judgment of the Appellate Court and remand this case to the circuit court for a new trial. We provide some background facts as they were presented to the jury and the procedural history that preceded this Court's consideration of the case.

## I

Ms. Akers and her husband, Ian Akers, lived in Columbia, Maryland, with their two young children. Ms. Akers became pregnant in early 2018, and she initially disclosed her pregnancy to her husband. At some point, she told her husband that the pregnancy was ectopic and that it had ended.[1] Ms. Akers did not tell anyone else that she was pregnant.

On November 1, 2018, at approximately 3:30 p.m., Ms. Akers delivered a baby alone in her bathroom. When Mr. Akers returned home from the bus stop after picking up their son, he found Ms. Akers in their bathroom bleeding profusely. Ms. Akers did not tell Mr. Akers why she was bleeding. Mr. Akers called 911. Upon arrival, the first responders found Ms. Akers sitting in her living room with her husband and two children. Ms. Akers reported that she had been experiencing heavy vaginal bleeding for the past several hours. She did not tell the first responders that she had just delivered a baby. She told them there

---

[1] An ectopic pregnancy is a pregnancy that results from a fertilized female reproductive cell implanting outside of the uterus. Erik Hendriks et al., *Ectopic Pregnancy: Diagnosis and Management*, 101 Am. Fam. Physician 599, 599 (2020).

was no chance she was pregnant, and that she had an ectopic pregnancy some time ago. When a paramedic asked if she wanted to go to the hospital, she said yes.

The first responders transported Ms. Akers to Howard County General Hospital. She asked the staff not to share her medical information with her husband or her family. A nurse met Ms. Akers in an examination room at the hospital; her clothing was saturated with blood. Ms. Akers told the nurse about a purported pregnancy in May 2018. However, she did not disclose that she had given birth that day until the nurse removed her clothing and saw a severed umbilical cord protruding from Ms. Akers' vagina. When questioned by a hospital emergency room physician and an obstetrician who was on call at the time, Ms. Akers finally admitted to delivering a baby at home. When asked about the baby's whereabouts, Ms. Akers told the doctors that it was in a closet at home in a plastic bag.

Hospital staff notified the first responders and law enforcement, who returned to the Akers' home in an effort to recover the baby. There was blood throughout the upstairs hallway, bathroom, and bedroom. The first responders located the body of a male baby in a bag with bloody towels. The baby was not breathing and had no pulse. Because the first responders found no signs of life, they did not perform CPR.

In the meantime, hospital staff brought Ms. Akers to the labor and delivery unit to deliver the placenta and repair her vaginal lacerations. Ms. Akers received a local anesthetic and a narcotic intravenously, but she still could not tolerate the vaginal examination. Ms. Akers was transferred to an operating room, where an anesthesiologist administered intravenous sedation. The on-call obstetrician surgically repaired the vaginal lacerations, and the surgery ended at 8:36 p.m.

*A. Ms. Akers' Post-Delivery Hospital Interviews*

A little less than an hour after Ms. Akers awakened from the general anesthesia, she was questioned by a detective assigned to the Family Crimes Division of the Howard County Police Department and a Child Protective Services ("CPS") social worker.[2] The following day, she was interviewed by the hospital's perinatal social worker and psychiatrist. During the interviews, she recounted her pregnancy and delivery.

### 1. Explanation of Pregnancy

Ms. Akers told the hospital's perinatal social worker that she realized in late April 2018 that she may be pregnant and spoke to her husband about it. Their plans at that time did not include a new pregnancy, and they discussed terminating it.

In May, Ms. Akers saw her doctor to confirm the pregnancy. The doctor told her that the pregnancy was normal and that she was 15 weeks pregnant. According to Ms. Akers, the doctor told her it was too late to terminate the pregnancy, although the medical records reflect that the doctor provided her with information pertaining to clinics that performed second-trimester abortions.

---

[2] Prior to her criminal trial, Ms. Akers filed a motion to suppress statements that she made to the detective while she was in the hospital. Ms. Akers argued that the court erred in concluding that her statements to the detective were voluntary. The statements were made within a few hours after Ms. Akers was placed under general anesthesia, which involved the administration of midazolam, fentanyl, and propofol. On appeal, the Appellate Court concluded, based upon the totality of the circumstances, that the State met its burden of demonstrating by a preponderance of the evidence that Ms. Akers' statements were voluntary under both Maryland and federal law. *Akers v. State*, No. 0925, 2024 WL 338958, at *16 (Md. App. Ct. Jan. 30, 2024). In her petition for writ of *certiorari*, Ms. Akers did not seek review of this issue. Accordingly, it is not before us.

4

Thereafter, Ms. Akers told her husband that the pregnancy was ectopic and that it had ended. Ms. Akers explained to the detective that she failed to tell her husband that she did not have the abortion for two reasons. First, she had decided to give up the baby for adoption. Second, she told the detective that she was in "denial" over the pregnancy and "[a]lmost" hoped something would happen so the pregnancy would go away. Still, she never attempted to terminate the pregnancy.

Aside from initially disclosing the pregnancy to her husband, Ms. Akers did not tell any family or friends that she was pregnant. Ms. Akers relayed to the detective that she did not tell her family members about the pregnancy because they are Catholic, and she would be stigmatized for considering an abortion or adoption.

For these reasons, Ms. Akers explained, she decided to use a safe haven for newborns[3] instead of giving "up the baby officially through adoption." Ms. Akers similarly described her safe haven plan to the hospital's social worker, who reported that Ms. Akers "identified significant denial and guilt in managing [the] pregnancy from June through delivery yesterday but explains her plan at delivery was to bring the baby to the hospital or fire department as a 'Safe Haven.'"

On the day following the birth, Ms. Akers had a consultation with the hospital's psychiatrist, who noted the following:

> [Patient] presented tearfully and emotional. She told me that she took a pregnancy test in May because she was having [abdominal] pain and spotting

---

[3] The "safe haven for newborns" statute that was in effect in 2018 provided that a person who leaves an unharmed newborn with a responsible adult within ten days after the newborn's birth will have immunity from civil liability or criminal prosecutions. Md. Code. Ann., Courts and Judicial Proceedings ("CJ") § 5-641(a)(1) (2020 Repl. Vol.).

and found out that she was pregnant. She had to wait for her [obstetrical] appointment x 2 weeks and at the appointment found out that it was too late to terminate pregnancy. She told me that both her and her husband felt that this is not a good time for them to have another child. She told husband that she had an ectopic pregnancy and was given medication. She told me that she was in denial. She told me that throughout the pregnancy she was not showing at all and that only contributed to her denial of being pregnant. She did not tell her family or friends and no one knew that she was pregnant. Today [patient] reported that she feels mad and dissappointed [sic] with herself that she "made stupid decisions." She is worried that her family will reject her because her sister is undergoing treatment for melanoma and may not be able to have children at all.

### 2. *Explanation of Delivery*

In the hospital interviews, Ms. Akers consistently maintained that the baby was stillborn. She stated that she had not felt the fetus moving inside of her for several days and concluded "it had already passed." She stated that she had not slept well the night before the delivery because of the contractions. She continued to have contractions throughout the day of her delivery and realized she was in labor. At the start of the day, Ms. Akers dressed her son, made him breakfast, and packed lunch for him before resting with her daughter. Her stomach began hurting, and she took a bath to try to make herself feel better. Later in the day, she made lunch for her daughter and put her down for a nap. She then began to rest, but the contractions started getting heavier, and her water broke. She felt like she had to go to the bathroom, and, after trying to go to the bathroom for a long time, she delivered the baby into the toilet.

Ms. Akers said she grabbed a nearby towel and immediately retrieved the baby from the toilet. According to Ms. Akers, she detected no signs of life in the baby, which was not moving, breathing, or crying. She stated that she was sad that the baby was stillborn. She wrapped the body in a towel and carried the body from the bathroom to the bedroom.

6

Ms. Akers recounted that she heard no crying and saw no movement in the baby. She cut the umbilical cord using cuticle scissors.

Ms. Akers explained that she did not know what to do, and that she did not ask for help because she thought it was too late. She reported that she felt panicked, overwhelmed, and scared. She placed the baby in a nearby plastic clothing bag and put the bag in the closet under a blanket.

Although Ms. Akers' husband was home throughout the day, he was meeting their son at the school bus stop at the time of the delivery. Their daughter was still napping in her crib. Ms. Akers was cleaning up blood in the bathroom when her husband found her. She did not tell him that she had delivered the baby. Mr. Akers was overwhelmed by the sight of the blood and called 911.

### B. Criminal Investigation

Upon discovering the infant's body in the closet, the police immediately treated the Akers' house as a crime scene. Police recovered a blood-soaked towel on the stairs and a blood-soiled bathmat in the washing machine. Additionally, they recovered the pair of scissors that Ms. Akers used to cut the umbilical cord. Police took Ms. Akers' cellphone and, upon inspection of the search history, discovered the self-help termination searches, which had occurred between six and eight months before the delivery. We discuss the termination searches in more detail below.

### C. Pre-Trial Motions

Before trial, Ms. Akers filed a motion *in limine* asking the circuit court to exclude evidence about the termination searches and her lack of prenatal care as irrelevant and

7

unfairly prejudicial. Ms. Akers pointed out that Maryland law prohibits the State from interfering with a woman's decision to abort a non-viable fetus.[4] Ms. Akers also argued that the State could not prove guilt by introducing evidence that a person was contemplating exercising a constitutionally protected right.[5] Regarding forgoing obstetric prenatal care, Ms. Akers argued that there is no legal obligation to seek prenatal care and that a pregnant woman cannot be prosecuted for failure to act with regard to her own fetus.

The prosecutor did not present any argument on the relevance of Ms. Akers' lack of prenatal care and instead focused exclusively on arguments related to the admissibility of the termination searches. The prosecutor explained that the State intended to introduce evidence that from March 2018 through May 2018, Ms. Akers "performed internet searches on her phone and visited websites relating to how to cause a miscarriage and abortion[,]" and that the searches included "inquiries regarding medicine for causing an abortion." The prosecutor argued that Ms. Akers' abortion searches were "highly relevant and probative of the elements" of the charges of murder and first-degree child abuse. The prosecutor stated:

> We must prove, Your Honor, that the Defendant intended to kill her baby. And to prove the child abuse, we must prove that the Defendant caused serious injury or death and that it was intentional, either to commit the acts of abuse or failure to act. The fact that she was seeking to end her pregnancy

---

[4] Md. Code Ann., Health-Gen. ("HG") § 20-209(b)(1) prohibits the State from interfering with a woman's decision to terminate a pregnancy before the fetus is viable.

[5] At the time of Ms. Akers' trial, abortion was a federal constitutional right under *Roe v. Wade*, 410 U.S. 113, 153 (1973), and *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992). The Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 232 (2022), after Ms. Akers' trial.

is most highly relevant to proving her intent to kill the baby once it was born, and her intentional failure to obtain care for her child after the child was born.

Also, the prosecutor argued that abortion evidence was relevant to Ms. Akers' credibility:

Your Honor, additionally, after denying her pregnancy and the birth of her baby to EMTs and then to hospital personnel on November 1st, the doctors observed the umbilical cord and placenta. At which time, the Defendant provided statements that the baby was stillborn. Your Honor, she advised hospital personnel that she had been told it was too late to seek an abortion in May of 2018.

The evidence regarding her prior seeking of an abortion and the searches about abortion go to prove directly to her credibility, with respect to the information that she provided, and her intent at the time she committed these acts. Where, as here, Your Honor, you have the only witness to the birth as the Defendant, and she says the baby is stillborn. The evidence that she is lying certainly is relevant and probative, regarding her ability and wish to terminate her pregnancy. And, you know, she had that ability to do so legally, and chose not to do so in May of 2018. So, all of that goes to the relevance of what her intent was when she delivered this child in November of 2018, and then, as we are seeking to prove to the jury, killed that child.

Notwithstanding the fact that the prosecutor did not present any argument pertaining to the admissibility of the lack of prenatal care, the trial court denied Ms. Akers' motion in full, ruling that "both the researching the abortion issue and the lack of prenatal care, once the Defendant understands that she is expecting, are relevant to the issue of intent that the State's required to prove for their suggestion that it was a killing." Also, the trial judge stated that he "[did] not find that its prejudicial effect outweighs its probative value."

### D. Jury Trial

Ms. Akers' jury trial occurred over eight days in April 2022. Given that the central question presented for our review involves the admissibility of evidence related to Ms.

9

Akers' termination searches and her lack of prenatal care, we provide only a cursory overview of the other evidence for context.

### 1. General Overview of the Evidence

The central focus of the State's case was on whether Ms. Akers' pregnancy ended with a live birth or a stillbirth.[6] The State's theory was that Ms. Akers killed her baby after he was born alive. The defense maintained that Ms. Akers delivered a stillborn, who never took a breath. To support its position of a live birth, the State called Dr. Nikki Mourtzinos, the medical examiner who performed the autopsy. In the process of completing her investigation and report, Dr. Mourtzinos performed tests and analyzed data to determine if the fetus died in utero or after being born alive.[7] Based upon these tests and her analysis,

---

[6] To prove the crimes charged against Ms. Akers, the State needed to prove that Ms. Akers' delivery resulted in a "live birth," as defined by HG § 4-201(n), i.e., a baby that "breathes or shows any other evidence of life[.]" By contrast, Ms. Akers' defense was that her delivery resulted in a stillbirth or "fetal death," i.e., a death in which, after "expulsion or extraction" from the mother, "the fetus does not breathe or show any other evidence of life[.]" HG § 4-201(h).

[7] The tests and analysis conducted by Dr. Mourtzinos included examining the baby's body via x-ray, conducting a visual and tactile examination of the lungs, checking for maceration, and searching for abnormalities, infection, and bacterial invasion of the baby's body and the placenta. In addition to these tests, Dr. Mourtzinos conducted a hydrostatic float test ("HFT"), commonly known as the "floatation test" or "lung float test," which is used to determine if an infant's lungs had been aerated prior to death. Dr. Mourtzinos opined that, when in utero, the fetus's lungs are filled with liquid, not air; as the child is born and breathes, the lungs become aerated and inflate. The HFT involves removing the lungs, ensuring that air has not been artificially introduced into them, and placing them in water. If the lungs float, they have been aerated. If the lungs sink, they have not been aerated. Dr. Mourtzinos testified that the results of the HFT indicated that the infant's lungs had been aerated, there was no evidence of air being introduced by means other than breathing, and that those results were consistent with a variety of different tests which, in her opinion, were also indicative of a live birth.

she opined that the baby was born alive, and that the cause of death was homicide resulting from asphyxia and exposure.

The defense called Dr. Gregory Davis, a board-certified forensic pathologist, who testified that based upon his review of the evidence, he could not determine one way or another whether the baby died in utero and was therefore stillborn, or whether the baby had been born alive. The defense also presented the testimony of Dr. Richard Margolis, a board-certified specialist in obstetrics and gynecology and a practicing clinician for over 50 years. Over the course of his career, Dr. Margolis delivered an estimated 50 stillbirths. Dr. Margolis explained that the autopsy revealed clotted blood over approximately 30% of the placenta, indicating a partial abruption. He testified that the partial placenta abruption, in conjunction with the acute infections and severe inflammatory processes in the umbilical cord, placenta membranes, and placenta, would likely decrease oxygen flow to the fetus and lead to a stillbirth.

---

Prior to trial, defense counsel filed a motion *in limine* challenging the reliability of the HFT. The circuit court initially conducted a *Frye-Reed* hearing. The State and defense each called witnesses who testified as to the reliability of the HFT test. During the pendency of the case, this Court decided *Rochkind v. Stevenson*, 471 Md. 1 (2020), which adopted *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), for purposes of applying Md. Rule 5-702. At the second hearing, by agreement of the parties, the court incorporated the testimony from the prior hearing. The court gave the parties the opportunity to present additional arguments and testimony. Thereafter, the trial court ruled that Dr. Mourtzinos could present testimony concerning the HFT test. On appeal, Ms. Akers challenged that evidentiary ruling. *See Akers*, 2024 WL 338958, at *2–6. The Appellate Court held that the circuit court did not abuse its discretion in admitting Dr. Mourtzinos' testimony regarding the HFT test under Rule 5-702. *Id.* at *6. Ms. Akers did not seek review of this issue in her petition for writ of *certiorari*. Accordingly, that issue is not before us.

11

In addition to the expert testimony concerning whether the pregnancy ended in a live birth or a stillbirth, the State presented several other witnesses. Two first responders testified about the events they witnessed while responding to Mr. Akers' 911 call, including Ms. Akers' condition upon their arrival and statements she made prior to transport to the hospital. The first responders also recounted their return to the Akers' home after Ms. Akers admitted to hospital personnel that she had delivered a baby at home. They also testified about discovering the infant's body in the closet and the condition of the body.

An emergency room physician and a nurse involved in Ms. Akers' care when she arrived at the hospital each testified concerning the examination of Ms. Akers, as well as statements Ms. Akers made during the examination. Additionally, an on-call obstetrician testified about her examination of Ms. Akers on November 1, the medical procedure she performed, and her observations concerning the condition of the placenta and umbilical cord. A perinatal social worker employed by the hospital testified concerning her interactions with Ms. Akers in her hospital room on November 2. A detective with the Howard County Police Department testified concerning the statement Ms. Akers made following a medical procedure on November 1. The State also called Mr. Akers. Although Mr. Akers asserted spousal privilege, the trial court ruled that his testimony fell within a statutory exception, and he was therefore required to testify.[8] The trial court also ruled that the State could consider Mr. Akers a hostile witness and permitted leading questions. Mr.

---

[8] CJ § 9-106(a)(1)(i) provides that "[t]he spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves . . . [t]he abuse of a child under 18[.]"

12

Akers recounted the events of November 1 and confirmed that he learned that Ms. Akers had delivered a boy from the hospital personnel that evening.

The State's exhibits included Ms. Akers' medical records from the May 14, 2018 obstetrical appointment, the EMT reports, the medical records from Howard County General Hospital related to Ms. Akers' hospital admission, the 56-minute audio-recording of Ms. Akers' hospital interview with the detective, as well as a transcript of the interview, photographs taken when the first responders discovered the baby in the closet, the autopsy report and photographs, and the internet searches that were extracted from Ms. Akers' cellphone between March and May 2018.

### 2. The State's Evidence and Arguments Pertaining to the Termination Searches

The prosecutors called Joshua Lapier, a detective with the Howard County Police Department in the Digital Forensics Unit, to testify concerning the extraction analysis he performed on Ms. Akers' cellphone and the search history pertaining to the pregnancy termination searches that was compiled in connection with his analysis. The court admitted two extraction reports into evidence as exhibits. One extraction report contained a summary of terms that were searched by the user of the cellphone. The other extraction report contained a summary of web and browser history. The exhibits consisted of a total of 15 pages. The extraction reports revealed the following searches during the time period in which Ms. Akers could have lawfully terminated her pregnancy:

- March 4, 2018: "rue tea for abortion"
- March 4, 2018: "does rue extract cause you to miscarry"
- March 4, 2018: "over the counter pills that cause miscarriage"

- March 8, 2018: "miscarriage at 7 weeks"
- March 8, 2018: "miscarriage at 7 weeks do i need a d&c"
- May 4, 2018: "how to treat ectopic pregnancy naturally"
- May 4, 2018: "how to end a ectopic pregnancy"

Additional searches included "planned parenthood," "scheduling an abortion," and a search for "Misoprostol in Midtrimester Termination of Pregnancy: Oral and Vaginal in of" on eBay. Ms. Akers also visited a website titled "woman resort to over-the-counter remedies to end pregnancy" on March 14, 2018. After admitting the extraction reports into evidence over defense counsel's objection, the trial court allowed Detective Lapier to summarize the searches for the jury.

The prosecutor also introduced into evidence Ms. Akers' discussion with her obstetrician, Dr. Danielle Waldrop, about the termination of the pregnancy.[9] According to Ms. Akers' medical records and Dr. Waldrop's testimony, Ms. Akers visited her obstetrician on May 14, 2018. Dr. Waldrop ordered an ultrasound, and the medical record states: "Ultrasound Complete (> 14 wks) (In-House)." Dr. Waldrop's notes reflect that Ms. Akers was very emotional during the appointment, needed to be consoled, and was unable to complete the exam. Dr. Waldrop discussed the possibility of terminating the pregnancy with Ms. Akers, and the medical records indicated that the office gave her information for local clinics that perform second trimester abortions.

---

[9] Dr. Waldrop's testimony and medical records reflected that she discussed with Ms. Akers the possibility of terminating her pregnancy and that her office provided Ms. Akers with information about local abortion clinics. This evidence was admitted without objection. Ms. Akers' petition for writ of *certiorari* asked us to consider only the admissibility of the internet searches related to termination of a pregnancy. Accordingly, our discussion concerning the admissibility of abortion evidence is limited to the internet searches.

14

The prosecutor's narrative throughout the trial was that Ms. Akers' contemplation of abortion showed that she intended to kill the child at birth and was untruthful about her "safe haven" plan. The prosecutor began her opening statement by asserting that Ms. Akers' contemplation about abortion revealed her choice not to let the newborn live:

> She chose to not let that baby live.
>
> As early as March of 2018 when she would have been approximately five weeks along, she at least suspected she was pregnant. She made Internet searches for brew extracts that would cause termination. She Googled [ectopic] pregnancies. And she waited until May 14th of 2018 to go see her OBGYN. At that time[,] she was fifteen weeks along. She went to see her doctor at that time [after] having waited those ten weeks, to discuss termination.
>
> . . . .
>
> She has six months from that time of her appointment until the time of his birth to think about what she was going to do when he came into this world. To think about alternative ways that he could live. That she did not want him, but that others would. Six months of choices.

In closing argument, the prosecutor told the jury that Ms. Akers wanted to terminate the pregnancy and that contemplating abortion was proof of her later intent to kill a child:

> Perfect, beautiful Baby Boy Akers was born and died on November 1st, 2018. He lived only a few moments, taking a few breaths, before his mother, the defendant, snuffed out his life. Why? Because she didn't want another child. She wanted to terminate this pregnancy and when she chose not to, she took matters into her own hands upon his birth that afternoon[,] at around 3:30 on November 1st of 2018.

The prosecutor emphasized that "[s]he intended his death, ladies and gentlemen. She had a plan to terminate the baby."

15

*3. The State's Evidence Pertaining to Lack of Prenatal Care*

Unlike the termination searches, which were prominently featured in the presentation of the State's case, there was very little evidence presented on Ms. Akers' lack of prenatal care. The evidence consisted of: (1) two references in the medical records; (2) one reference in the interview between the detective and Ms. Akers that was admitted into evidence, which the detective also referenced in her testimony; and (3) one reference in the testimony of the hospital nurse when she described Ms. Akers' medical history that Ms. Akers provided upon her arrival at the hospital. The State did not discuss this evidence or mention Ms. Akers' lack of prenatal care in either opening or closing arguments.

The jury found Ms. Akers guilty of second-degree murder and child abuse resulting in death. The jury acquitted her of first-degree murder. The trial court sentenced Ms. Akers to 30 years of imprisonment for murder and a concurrent 20 years of imprisonment for child abuse resulting in death.

### E. The Appellate Court of Maryland

Ms. Akers timely appealed her conviction to the Appellate Court of Maryland. The Appellate Court affirmed her conviction. *Akers v. State*, No. 0925, 2024 WL 338958 (Md. App. Ct. Jan. 30, 2024).[10] Pertaining to the issues presented here—the admissibility of the

---

[10] In her appeal to the Appellate Court, Ms. Akers raised several issues that are not part of this Court's review. In addition to the issues described in notes 2 and 7 *supra*, Ms. Akers challenged the legal sufficiency of the evidence, asserting that the evidence did not establish that the baby was born alive. *Akers*, 2024 WL 338958, at *17. The Appellate Court concluded that "the record evidence was sufficient for a rational jury to find that [Ms. Akers'] child was born alive, and that her actions caused his death." *Id.* at *18. Accordingly, the Appellate Court concluded that there was sufficient evidence for the jury

16

evidence of Ms. Akers' lack of prenatal care and internet searches related to abortion—the Appellate Court held that both types of evidence were relevant and that the trial court did not abuse its discretion in admitting the evidence. *Id.* at *8–13.

Regarding the lack of prenatal care, the Appellate Court determined that the State's relevance argument was "bolstered by evidence" that Ms. Akers "had previously sought and received prenatal care for prior pregnancies and had attended an appointment with an OBGYN to confirm" this pregnancy. *Id.* at *9. Turning to the potentially prejudicial effect of the evidence, the Appellate Court acknowledged that "pregnant women do not always receive prenatal care for a variety of reasons, including the accessibility of such care," and agreed with Ms. Akers that "prejudice could arise due to gender-based stereotypes and biases regarding the ways in which pregnant women are expected to behave." *Id.* The Appellate Court also recognized "that electing not to seek prenatal care is both a legally protected activity in Maryland," and "that as a general principle, a lack of prenatal care is typically either irrelevant or minimally probative of a mother's intent to subsequently harm her child after birth." *Id.* That said, the Appellate Court held that the trial court did not abuse its discretion in admitting this evidence because "the facts of this case are far from typical." *Id.*

With respect to the evidence of internet searches related to abortion, the Appellate Court "note[d] at the outset" that its decision "should be read narrowly, and in strict accordance with the specific facts of this case." *Id.* at *10. The Appellate Court considered the chain of inferences relied upon by the State and concluded that "in the context of other

_____

to return guilty verdicts on both counts. *Id.* These issues also were not part of Ms. Akers' petition for writ of *certiorari* and are not before us.

17

admitted evidence," Ms. Akers' actions made it "more probable that she intended to prevent others from discovering her pregnancy or child at any point." *Id.* The Appellate Court concluded that such conduct "in turn permits an inference that she would be inclined to harm or cause the death of the child to keep the pregnancy and birth secret." *Id.* The Appellate Court also determined that the evidence was relevant to Ms. Akers' credibility. *Id.* at *12.

Although the Appellate Court recognized "that abortion and other forms of reproductive healthcare carry with them the potential risk of unfair prejudice," the Appellate Court was unable to determine that the circuit court abused its discretion in admitting the evidence in the context of the other evidence presented in this case. *Id.* at *13.

## II

Our review of the trial court's decision to admit evidence involves a two-step analysis. First, we determine whether the evidence was relevant, which is a conclusion of law that we review de novo. *Montague v. State*, 471 Md. 657, 673 (2020) (citing *Portillo Funes v. State*, 469 Md. 438, 478 (2020)).[11] "While trial judges are vested with discretion

---

[11] The Dissent points out that earlier cases have stated that we review a trial judge's determination of relevance for abuse of discretion. Dissent Slip Op. at 16 n.10. *See, e.g.*, *Young v. State*, 370 Md. 686, 720 (2002) ("This Court reviews a trial court's determination of relevance under an abuse of discretion standard."); *Thomas v. State*, 301 Md. 294, 317 (1984) ("Decisions on the relevance of evidence rest in the sound discretion of the trial court and will not be reversed absent a showing that such discretion was clearly abused."). In *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 620 (2011), we stated that "[w]hile the 'clearly erroneous' standard of review is applicable to the trial judge's factual finding that an item of evidence does or does not have 'probative value,' the 'de novo' standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not 'of consequence to the determination of the action.'" (Citations omitted). Other cases over the past several years have consistently stated that relevancy

18

in weighing relevancy in light of unfairness or efficiency considerations, trial judges do not have discretion to admit irrelevant evidence." *State v. Simms*, 420 Md. 705, 724 (2011); *see also Parker v. State*, 408 Md. 428, 436–37 (2009) (explaining that the de novo standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not "of consequence to the determination of the action" (quoting Md. Rule 5-401)); *Pearson v. State*, 182 Md. 1, 13 (1943) (noting that "the rule [of discretion] will not be extended to facts obviously irrelevant as well as prejudicial to the defendant").

If we determine that the evidence in question is relevant, we proceed to the second step—whether the evidence is inadmissible because its probative value is outweighed by the danger of unfair prejudice, or other countervailing concerns as outlined by Maryland Rule 5-403. In connection with this second inquiry, "we consider whether the trial court abused its discretion by admitting relevant evidence which should have been excluded as unfairly prejudicial." *Montague*, 471 Md. at 673. The second inquiry—the trial judge's

determinations are reviewed de novo. *See, e.g.*, *DeLeon v. State*, 407 Md. 16, 20 (2008) ("The determination of whether evidence is relevant is a matter of law, to be reviewed *de novo* by an appellate court."); *Ford v. State*, 462 Md. 3, 46 (2018) ("An appellate court reviews without deference a trial court's conclusion as to whether evidence is relevant."); *Santiago v. State*, 458 Md. 140, 160–61 (2018) (explaining that a reviewing court tests for legal error when considering whether evidence is legally relevant); *Williams v. State*, 457 Md. 551, 563 (2018) ("When the circuit court determines whether a piece of evidence is relevant, that is a legal conclusion, which is reviewed without deference."); *Gonzalez v. State*, 487 Md. 136, 166 (2024) ("An appellate court reviews de novo a trial court's determination as to whether evidence is relevant." (quoting *Portillo Funes v. State*, 469 Md. 438, 478 (2020))). To the extent that statements in earlier cases are inconsistent with statements in more recent cases concerning the de novo standard of review, that issue has not been briefed or raised by any party. Moreover, even if it were raised and the Court determined that we should apply an abuse of discretion standard (notwithstanding our repeated assertion that the standard is de novo), we would reach the same outcome with respect to the trial court's decision to admit this evidence.

discretionary ruling of the admissibility of evidence under Rule 5-403—is subject to the abuse of discretion standard. *Id.* at 673–74; *Simms*, 420 Md. at 725.

<h1 style="text-align:center">III</h1>

A central evidentiary principle in our legal system is that only relevant evidence is admissible. *See* Md. Rule 5-402 ("Evidence that is not relevant is not admissible."). Trial courts do not have discretion to admit irrelevant evidence. *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 620 (2011). While "[i]t is true that relevance is generally a low bar," relevance "is a legal requirement nonetheless." *Simms*, 420 Md. at 727. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Two characteristics of relevant evidence are: (1) materiality and (2) probative value. *Williams v. State*, 342 Md. 724, 737 (1996) (quoting *State v. Joynes*, 314 Md. 113, 119–20 (1988)).

Evidence is material if it bears on a fact of consequence to an issue in the case. *Id.* at 736–37; *see also Lai v. Sagle*, 373 Md. 306, 319 (2003). "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case." *Joynes*, 314 Md. at 119; *see also* 1 *McCormick on Evid.* § 185, at 1106 (8th ed. 2020) ("Materiality concerns the fit between the evidence and the case."). "If the evidence is offered to help prove a proposition that is not a matter in issue, it is immaterial." 1 *McCormick on Evid.* § 185, at 1106 (8th ed. 2020). A matter in issue is one that is "within the range of the litigated controversy[.]" *Id.*

On the other hand, probative value "is the tendency of evidence to establish the proposition that it is offered to prove." *Joynes*, 314 Md. at 119. Evidence is probative if it is "related logically to a matter at issue in the case[.]" *Snyder v. State*, 361 Md. 580, 591 (2000). In turn, for evidence to be "related logically" to a matter at issue, the court "must be satisfied . . . that its admission increases or decreases the probability of the existence of a material fact." *Id.* The probative value inquiry—and therefore also the relevancy inquiry as a whole—often depends upon how attenuated the evidence is to the material fact it is intended to prove or disprove. Where the proffered evidence is several inferential leaps removed from the consequential fact, or where it involves a speculative chain of inferences to reach a determination, the less likely the evidence will make that fact more or less probable. This means that the evidence is not probative and, therefore, is irrelevant.

Evidence also lacks probative value when its relevancy depends on attributing meaning to actions too "ambiguous and equivocal" to support the proposition for which it is offered. *Snyder*, 361 Md. at 596. When a person's conduct is equivocal and therefore equally consistent with multiple interpretations, it invites improper speculation by the factfinder as to the meaning of that conduct. *See, e.g.*, *Weitzel v. State*, 384 Md. 451, 456–58 (2004) (holding that pre-arrest silence in the presence of the police was "too ambiguous to be probative" of guilt because there are valid reasons for the innocent to refuse to speak to police); *Simms*, 420 Md. at 731 (holding that filing a notice of alibi but not calling an alibi witness was irrelevant as "too ambiguous and equivocal" because the conduct could "support inferences other than an intent to create false exculpatory evidence"); *Hunter v. State*, 82 Md. App. 679, 691 (1990) (finding that a search for legal counsel was irrelevant

21

to consciousness of guilt because a person seeking legal counsel "may just as well believe himself entirely innocent or only partly culpable, or he simply may not know whether his acts or omissions are in violation of the law"). Cases from this Court and the Appellate Court highlight the application of these principles in undertaking our de novo review of relevancy determinations by the trial court.

In *Fuentes v. State*, this Court upheld the trial court's determination to exclude, on the basis of relevance, a victim's employment records as a housekeeper to establish that she had the mental capacity to consent to the sexual conduct at issue in the case. 454 Md. 296, 326 (2017). We explained that whether the victim "was able to perform various housekeeping duties was several inferential leaps removed from whether she was capable of" consenting and understanding the nature of the sexual conduct. *Id.*

In *Snyder v. State*, this Court held that the jury was improperly "asked to presume" that the defendant's failure to inquire into the status of an investigation of his wife's murder was probative of an absence of a loving relationship and then asked the jury to "speculate" that this was "indicative" of a guilty conscience. 361 Md. at 596. In other words, the evidence was not relevant because its probative value turned on a series of inferences that "invite[d] the jury to speculate." *Id.*

In *Vitek v. State*, this Court held that the evidence that a criminal defendant was poor and unemployed was irrelevant in a robbery trial absent a specific link between the defendant's financial desperation and the crime. 295 Md. 35, 40–42 (1982). We explained that without a specific link between the defendant's poverty and motive, "the chain of

22

inferences is too speculative." *Id.* at 45 (quoting *United States v. Mullings*, 364 F.2d 173, 175–76 (2d Cir. 1966)).

In *Gupta v. State*, the Appellate Court held that evidence that a witness carried a camping knife "for protection" was irrelevant to show that she, and not the defendant, was the perpetrator of a fatal stabbing. 227 Md. App. 718, 742–43 (2016). The Appellate Court noted that "[t]he knife in question was not the murder weapon" and reasoned that "carrying a knife and plunging it into the body of another are two very different propositions." *Id.* at 743 (cleaned up). In other words, the court concluded, the fact that the witness "carried a knife with her at some point [did] not make her more or less likely to have stabbed [the victim]." *Id.*

The trial court's admissibility inquiry ends if the evidence is found to be irrelevant. If the trial court determines that the evidence is relevant, the evidence may nonetheless be excluded where the probative value of the relevant evidence "is substantially outweighed by the danger of unfair prejudice." Md. Rule 5-403. Against the backdrop of these analytical principles guiding the admissibility of evidence, we turn to the specific evidentiary rulings in question.

**IV**

Ms. Akers contends that evidence of her internet searches about terminating her pregnancy between six and nearly eight months before delivery have no logical connection to an intent to kill or harm a newborn at birth. Nor, according to Ms. Akers, does her contemplation of a protected right to terminate a pregnancy during the period in question make the later existence of a specific intent to kill the newborn or an adoption plan more or less probable. Ms. Akers asserts that a woman's consideration of an abortion is neither

23

contemplation of murder at birth nor impeachment of her desire to put a baby up for adoption once it is born. Additionally, Ms. Akers argues that, even if the abortion searches were relevant, the prejudicial effect of this highly inflammatory evidence far exceeded any probative value.

The State argues that the termination searches were relevant to Ms. Akers' motive and intent to kill the baby once it was born. Specifically, the State asserts that the searches evidenced her general desire not to have a child and helped establish her motive to kill the baby even if it was born alive. According to the State, even if the jury did not ascribe an intent to murder from the termination searches to support a first-degree murder conviction, the searches helped establish that Ms. Akers had no plan if the baby was born alive, which the State asserts would support a finding that she committed second-degree murder and first-degree child abuse. Finally, the State contends that the termination searches were relevant to undercut Ms. Akers' credibility. The State points out that she conducted the searches in early March and early May of 2018, and the dates of the searches make it apparent that Ms. Akers knew then that she was pregnant and was considering ways to end the pregnancy. The State notes that, during Ms. Akers' hospital interviews with the social worker and the detective, she stated that it was too late to terminate the pregnancy by the time she learned she was pregnant. The State asserts that the timing of her termination searches, together with the evidence that Dr. Waldrop had provided her with two referrals for abortion clinics on May 14, disproves her assertion of timeliness.[12]

---

[12] At oral argument, the State asserted that the Court should exercise its discretion and conduct a harmless error analysis pursuant to its discretionary authority under

24

As part of our discussion of the admissibility of the abortion searches in this case, it is instructive to discuss: (1) Maryland laws that protect women's reproductive rights and reject the concept of fetal personhood of a non-viable fetus; (2) some abortion-related statistics; and (3) studies and research that discuss the abortion stigma prevalent in our country.

### A. Maryland Laws Protecting Women's Reproductive Rights

Maryland law recognizes the fundamental difference between a fetus and a baby and rejects the concept of fetal personhood.[13]  *See* Md. Code Ann., Crim. Law ("CR") § 2-103(g) (2021 Repl. Vol.) (stating that, for the purposes of Maryland homicide law, "[n]othing in this section shall be construed to confer personhood or any rights on the fetus"); *see also Kandel v. White*, 339 Md. 432, 443 (1995) (refusing to recognize a cause of action for the wrongful death of a nonviable fetus, and expressing agreement with the New Hampshire Supreme Court's reasoning that to hold otherwise would be "giving a nonviable fetus a cause of action for negligence *before it becomes a person*, in the real and usual sense of the word, by being born alive" (emphasis added) (quoting *Wallace v. Wallace*, 421 A.2d 134, 136–37 (N.H. 1980))).

---

Maryland Rule 8-131(b).  We decline to exercise our discretion in this case.  The State did not raise harmless error before the Appellate Court, nor did the State raise harmless error in its answer to Ms. Akers' petition for writ of *certiorari* or in its brief before this Court. At oral argument, the State conceded that it had not briefed harmless error.  Accordingly, we consider that issue waived.

[13] "Fetal personhood" is a legal theory that attempts to redefine a person or human being as existing from the moment of fertilization of an egg and grants a fetus equal protection under the law.  *See, e.g.*, *When Fetuses Gain Personhood: Understanding the Impact on IVF, Contraception, Medical Treatment, Criminal Law, Child Support, and Beyond*, Pregnancy Just., Aug. 17, 2022, at 3–4, *available at* https://perma.cc/PQ7A-5237.

Consistent with the recognition that non-viable fetuses are not persons, all women in Maryland have a statutory and constitutional right to freely decide whether to terminate a pregnancy.[14]  *See* Md. Code Ann., Health-Gen. ("HG") § 20-209 (2023 Repl. Vol.).[15]

---

[14] At the time of Ms. Akers' trial, her constitutional reproductive rights were set forth in *Roe*. Thereafter, in *Dobbs*, the United States Supreme Court eliminated the federal constitutional protections for women's reproductive freedom. 597 U.S. at 232. In 2023, the General Assembly enacted the "Right to Reproductive Freedom Act," which placed a constitutional amendment before the Maryland voters that "confirms an individual's fundamental right to an individual's own reproductive liberty" guaranteed by Maryland law. 2023 Md. Laws, ch. 245. The amendment states that "every person, as a central component of an individual's rights to liberty and equality, has the fundamental right to reproductive freedom, including but not limited to the ability to make and effectuate decisions to prevent, continue, or end one's own pregnancy." The amendment was adopted by the voters of Maryland on November 5, 2024.

[15] The entirety of HG § 20-209 states:

(a) In this section, "viable" means that stage when, in the best clinical judgment of the qualified provider based on the particular facts of the case before the qualified provider, there is a reasonable likelihood of the fetus's sustained survival outside the womb.

(b) Except as otherwise provided in this subtitle, the State may not interfere with the decision of a woman to terminate a pregnancy:
(1) Before the fetus is viable; or
(2) At any time during the woman's pregnancy, if:
    (i) The termination procedure is necessary to protect the life or health of the woman; or
    (ii) The fetus is affected by genetic defect or serious deformity or abnormality.

(c) The Department may adopt regulations that:
(1) Are both necessary and the least intrusive method to protect the life or health of the woman; and
(2) Are not inconsistent with established clinical practice.

(d) The qualified provider is not liable for civil damages or subject to a criminal penalty for a decision to perform an abortion under this section made in good

The statutory right is broad and unequivocal, providing that prior to viability "the State may not interfere with the decision of a woman to terminate a pregnancy[.]" HG § 20-209(b). This Court has explained that Maryland law guarantees the right "to decide whether to bear a child" and that Section 20-209 demonstrates "clear, strong, and important Maryland public policy" to protect a person's right to obtain an abortion. *Lab Corp. of Am. v. Hood*, 395 Md. 608, 624–25 (2006) (quoting *Reed v. Campagnolo*, 332 Md. 226, 237 (1993)); *see also Jocelyn P. v. Joshua P.*, 259 Md. App. 129, 173 n.10 (2023) (observing that "under Maryland law, the ultimate decision whether to terminate or carry a pregnancy to term is entrusted solely to the woman when a pregnancy has been established").

The State's criminal laws also recognize a woman's right to be free from criminal prosecution for exercising her reproductive rights. Specifically, although the State may institute a criminal prosecution for murder or manslaughter of a viable fetus, the General Assembly has made clear that the criminal statute: (1) does not apply to or infringe on a woman's right to terminate a pregnancy under state law; and (2) does not apply to an act or the failure to act of a pregnant woman in regard to her own fetus. *See* CR § 2-103. Furthermore, the criminal statute expressly states that "[n]othing in this section shall be construed to confer personhood or any rights on the fetus." *Id.* § 2-103(g).

In addition to the statutory protections associated with a woman's right to engage in her reproductive rights free from criminal prosecution, this Court has recognized the importance of ensuring the State does not criminalize a woman's behavior for actions that

---

faith and in the qualified provider's best clinical judgment in accordance with accepted standards of clinical practice.

she undertakes while pregnant that may ultimately cause harm to a child. In *Kilmon v. State*, this Court rejected the State's interpretation of Maryland's reckless endangerment statute as applying to the conduct of a pregnant woman, holding that her intentional ingestion of cocaine could not form the basis for a conviction for the reckless endangerment of the later-born child. 394 Md. 168, 170 (2006). We observed that the State's interpretation could subject a woman to criminal liability for "a whole host" of activity that might reasonably be expected to endanger the life of a child, including "ordinary things [such] as skiing or horseback riding." *Id.* at 177–78. We also noted that "criminal liability would depend almost entirely on how aggressive, inventive, and persuasive any particular prosecutor might be." *Id.* at 178.

## B. Abortion—A Common Yet Highly Stigmatized Event

### 1. Some Statistics

Having an abortion is a common event in the reproductive lives of millions of women in the United States. Nearly a quarter of women in this country will have an abortion by age 45. *Fact Sheet: Abortion in the United States*, Guttmacher Inst. (June 2024), *available at* https://perma.cc/8J52-QDZB.[16] Abortion is also common among people who already have children—55% of women in the United States who have abortions already have at least one child. *Id.*

---

[16] *See also* Kate Cockrill et al., *The Stigma of Having an Abortion: Development of a Scale and Characteristics of Women Experiencing Abortion Stigma*, 45 Persps. on Sexual & Reprod. Health 79, 79 (2013) (stating that "[e]ach year, 1.2 million women in the United States have abortions," and "nearly one-third of women have an abortion during their reproductive years").

Women's reasons for seeking an abortion vary. One 2013 study showed that the most common reason for seeking an abortion was not being financially prepared to have a child. M. Antonia Biggs et al., *Understanding Why Women Seek Abortions in the US*, 13 BMC Women's Health, 13, 29 (2013). One-third of the study respondents cited unsupportive or abusive partners, 19% felt that they were not emotionally or mentally prepared to be a parent, 12% cited health-related issues, and 7% felt they were not independent or mature enough for a baby. *Id.* Only 3% of the respondents said they terminated the pregnancy because they did not want a baby. *Id.*

Many women who consider abortion do not ultimately have one. A 2018 study looked at pregnant women aged 18 and over—including participants from Baltimore—encountered at prenatal care facilities. Sarah C.M. Roberts et al., *Consideration of and Reasons for Not Obtaining Abortion Among Women Entering Prenatal Care in Southern Louisiana and Baltimore, Maryland*, 16 Sexuality Rsch. & Soc. Pol'y 476, 477, 479 (2018). Among the Maryland women, 34% had considered abortion, 21% considered an abortion but took no further steps to obtain one, 13% called a clinic, and only 3% went to the appointment. *Id.* at 482.

Not all abortions are performed in medical clinics. Self-managed abortions[17] are often performed within the privacy of a woman's home. Common self-managed abortion practices include self-sourcing medication, such as misoprostol, mifepristone, or a

---

[17] A "[s]elf-managed abortion involves any action that is taken to end a pregnancy outside of the formal healthcare system[.]" Nisha Verma & Daniel Grossman, *Self-Managed Abortion in the United States*, 12 Current Obstetrics & Gynecology Rep. 70, 71 (2023).

combination of the two medications, or using herbs, plants, vitamins, or supplements. Nisha Verma & Daniel Grossman, *Self-Managed Abortion in the United States*, 12 Current Obstetrics & Gynecology Rep. 70, 71 (2023). Self-managed abortions are not uncommon—one study notes that 10.7% of U.S. women will attempt to self-manage an abortion during their lifetimes. Lauren Ralph et al., *Self-Managed Abortion Attempts Before vs After Changes in Federal Abortion Protections in the US*, 7 JAMA Network Open, 2024 7(7) e2424310, *available at* https://perma.cc/8Y55-5WBH.

Given the large percentage of women who either have an abortion or consider it at some point during their reproductive years, it is also unsurprisingly common for women to search on the internet for information pertaining to abortion, including searches about ways to self-manage an abortion outside of the medical system.[18] Of the women who search online for information about self-managed abortion, one study reflects that 28% follow through with the process. Ushma Upadhyay et al., *Barriers to Abortion Care and Incidence of Attempted Self-Managed Abortion Among Individuals Searching Google for Abortion Care: A National Prospective Study*, 106 Contraception 49, 53 (2022). Individuals consider self-managed abortions for a variety of reasons, including because of barriers to clinic-based abortion care, such as the distance to a clinic, financial challenges, or a lack of childcare availability. *Id.* at 52, 55. Additionally, some women may pursue self-managed options because of stigma related to the circumstances of the pregnancy or of

---

[18] For example, during a single month in 2017, there were "more than 200,000 Google searches for information regarding self-managed abortion in the United States." *Opposition to the Criminalization of Self-Managed Abortion*, Am. Coll. Obstetricians & Gynecologists (July 6, 2022), *available at* https://perma.cc/UFF5-2XGW.

having an abortion, a desire to avoid detection by an abusive partner, or to have a more private experience. *See* Abigail R. A. Aiken et al., *Demand for Self-Managed Medication Abortion Through an Online Telemedicine Service in the United States*, 110 Am. J. Pub. Health 90, 94–95 (2020).

## 2. Abortion Stigma

Notwithstanding that abortion is a common event in the lives of many women each year, it remains one of the most emotionally charged and divisive issues in this country. One study reflects that more than one-half of Americans aged 18 and older believe that having an abortion is morally wrong. Kate Cockrill et al., *The Stigma of Having an Abortion: Development of a Scale and Characteristics of Women Experiencing Abortion Stigma*, 45 Persps. on Sexual & Reprod. Health, 79 (2013). A 2024 study conducted by the Pew Research Center found that 36% of survey respondents say abortion should be illegal in all or most cases. *Public Opinion on Abortion*, Pew Rsch. Ctr. (May 13, 2024), *available at* https://perma.cc/774Z-8WDZ. Another study found that 47% of Americans think a woman who has an unlawful abortion should face penalties and nearly 30% think the penalties should include incarceration. Hanna Hartig, *Wide Partisan Gaps in Abortion Attitudes, But Opinions In Both Parties Are Complicated*, Pew Rsch. Ctr. (May 6, 2022), *available at* https://perma.cc/RC2V-YVMC. According to that study, 38% of people think life begins at conception and fetuses have rights, and 35% think legal abortion leads to carelessness with sex and contraception. *Id.*

Regardless of abortion's legal status, studies report that women who have abortions are frequently stigmatized, or fear such stigma. Indeed, "abortion stigma" is the topic of

31

considerable study, scholarship, and discussion.[19] Abortion stigma ascribes "negative attribute[s] . . . to women who seek to terminate a pregnancy[.]" Anuradha Kumar et al., *Conceptualizing Abortion Stigma*, 11 Culture, Health & Sexuality 625, 628 (2009). These biases are even more acute with respect to self-managed abortion. Megan K. Donovan, *Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care*, Guttmacher Inst. (Oct. 17, 2018), *available at* https://perma.cc/52L9-EV9S (explaining that "[a]bortion stigma is heightened when it comes to self-managed abortion, due at least in part to fear and misunderstanding about the process").

Because abortion stigma is "concealable"—that is, it arises only when a woman discloses her abortion—it can result in a woman engaging in secretive behavior, such as concealing the abortion. The connection between abortion stigma and secrecy is well-documented.[20] With this background in mind, we turn to the issue of whether Ms. Akers' termination searches were admissible.

---

[19] *See infra* note 20.

[20] *See, e.g.*, Report of the APA Task Force on Mental Health and Abortion, Am. Psych. Ass'n, 1, 85 (2008), http://www.apa.org/pi/wpo/mental-health-abortion-report.pdf (reporting on a study that found that "over 45%" of women who had gotten an abortion "felt a need to keep it secret from family and friends"); Franz Hanschmidt et al., *Abortion Stigma: A Systematic Review*, 48 Persps. on Sexual & Reprod. Health 169, 173 (2016) ("Data from four qualitative studies that investigated the effects of abortion stigma also consistently highlighted restrictive disclosure behaviors and a need for secrecy in women with an abortion history. Women cited anticipated negative judgment or treatment from friends, family, community and society as the main reason for keeping their abortion a secret."); M. Antonia Biggs et al., *Perceived Abortion Stigma and Psychological Well-Being Over Five Years after Receiving or Being Denied an Abortion*, 15 PLoS ONE 1, 3 (2020) (stating that "there is ample evidence indicating that women keep their abortions secret" which is associated "with perceived abortion stigma"); Kate Cockrill et al., *supra*, at 83 ("[P]revious research has shown that abortion stigma leads to secrecy about abortion . . . .").

### C. Ms. Akers' Abortion Searches Fail to Satisfy the Basic Relevancy Threshold

Ms. Akers had a constitutionally and statutorily protected right to search for information on how to terminate her pregnancy, including searching for options on how to terminate the pregnancy through self-managed care. The record clearly reflects that the prosecutor intended to, and did, in fact, link Ms. Akers' exercise of her right to contemplate the termination of her pregnancy with an intent to kill a newborn upon the delivery many months later.

In arguing that the evidence was admissible, the prosecutor contended that the abortion searches were "*highly relevant and probative of the elements*" of the charges of murder and first-degree child abuse resulting in death and that "*[t]he fact that she was seeking to end her pregnancy is most highly relevant to proving her intent to kill the baby once it was born, and her intentional failure to obtain care for her child after the child was born.*" The prosecutor also asserted that Ms. Akers' "seeking of an abortion and searches about abortion go to prove directly to her credibility, with respect to the information that she provided, and her intent at the time she committed these acts."

Once the trial court ruled that evidence of the termination searches was admissible, the evidence prominently featured in the prosecutor's opening statement, case-in-chief, and closing arguments to establish Ms. Akers' intent to kill a newborn at delivery. The prosecutor told the jury in her opening statement that "[a]s early as March of 2018," "she at least suspected she was pregnant. She made internet searches for brew extracts that would cause termination. She googled [ectopic] pregnancies." The prosecutor then

33

highlighted that Ms. Akers "*waited* until May 14" "to go see her" obstetrician—suggesting

that the timing of her obstetrical visit had some bearing on her motive or intent to kill or

harm a living baby.

After the trial court admitted the internet searches over the objections of defense

counsel, Detective Lapier read into the record the search terms that were identified on the

exhibits. In her closing argument, the prosecutor once again linked Ms. Akers'

contemplation of terminating the pregnancy to an intent to kill a baby upon delivery. The

prosecutor told the jury: "*What we do when we look back at the things that happened*

*[before the delivery] is to show what her intent and her plan and perhaps her motive are.*"

The prosecutor argued that the "[baby] lived only a few moments, taking a few breaths,

before his mother, the defendant, snuffed out his life. Why? Because she didn't want

another child. She wanted to terminate this pregnancy and when she chose not to, she took

matters into her own hands upon his birth[.]" The prosecutor concluded, stating that Ms.

Akers "intended his death, ladies and gentlemen. She had a plan to terminate the baby."[21]

We hold that Ms. Akers' termination searches months before she gave birth fail to meet

the basic threshold for admissibility. The termination searches were not probative of an intent

to kill or harm a baby at delivery many months later. Ms. Akers' contemplation of a protected

right to terminate a pregnancy many months prior does not make the later existence of a

---

[21] The State's choice of words improperly conflated two legally distinct concepts, evoked notions of fetal personhood, and muddied the water between Ms. Akers' legally protected right to terminate a pregnancy and homicidal intent. To obviate confusion and unfair prejudice, care should be taken to avoid using terminology associated with *termination of a pregnancy* to describe a person's "plan" *to kill a baby*.

specific intent to kill or harm a newborn more or less probable. Simply put, the predicate fact—*lawfully contemplating the termination of a pregnancy*—does not support the inferences advanced by the State—an *intent, plan, or motive to kill or harm a person.* The State's argument begs the question of how Ms. Akers' internet searches made it more likely that she had a homicidal intent toward a living newborn, unless one assumes that a person who researches abortion options is more likely to commit murder or harm a person.

According to the State, even if the jury did not ascribe an *intent* to kill or harm a baby from the termination searches to support a first-degree murder conviction, the searches helped establish that Ms. Akers had no plan if the baby was born alive, which the State asserts would support a finding that she committed second-degree murder and first-degree child abuse.[22] On this point, the State's relevancy theory is as follows: the fact that

---

[22] On the count of second-degree murder, Ms. Akers' jury was instructed as follows:

Second degree murder is the killing of another person while acting with an extreme disregard for human life. In order to convict the defendant of second degree murder, the State must prove:

  (1)  that Baby Akers was born alive;
  (2)  that the defendant caused the death of Baby Akers;
  (3)  that the defendant's conduct created a very high degree of risk to the life of Baby Akers; and
  (4) that the defendant, conscious of such risk, acted with extreme disregard of the life endangering consequences.

On the count of first-degree child abuse, the jury was instructed as follows:

The Defendant is charged with the crime of child abuse in the first degree. In order to convict the defendant of first degree child abuse, the State must prove:

  (1) That the baby was born alive;

Ms. Akers did not want the baby, along with evidence of how she furtively managed the pregnancy by keeping it a secret until its inevitable exposure, and her admission that her approach was just to hope that the pregnancy would "go away," tended to show that she denied the pregnancy until she was no longer able to do so. The State argues that once the baby was born alive, Ms. Akers decided to kill him. According to the State, the fact that Ms. Akers searched for "rue tea for abortion" and how to obtain misoprostol to end pregnancy shows that she was looking for ways to terminate the pregnancy undetected. We disagree with the State's relevancy argument for several reasons.

First, even assuming that the termination searches were material to a general motive—in other words, the termination searches undertaken early in the pregnancy helped to prove in a general sense that Ms. Akers did not want a third child, and therefore she would be more likely to kill or harm a live baby or even simply fail to have a plan for the baby upon delivery—the evidence is not probative and therefore fails the second part of the relevancy inquiry. Ms. Akers' internet searches conducted many months before

---

(2) That the defendant caused physical injury to Baby Akers as a result of cruel or inhumane treatment or a malicious act;
(3) That at the time of the conduct, Baby Akers was under 18 years of age;
(4) That, at the time of the conduct, the defendant was a parent of Baby Akers;
(5) That, as a result of the defendant's conduct, Baby Akers' health or welfare was harmed or threatened; and
(6) That defendant's conduct resulted in Baby Akers' death.

The failure to obtain medical assistance for a child may constitute cruel or inhumane treatment. Under Maryland law, parents are required to obtain necessary medical care for their minor children.

delivery do not make it any more probable that she failed to have a plan for a living child after the child was born. Absent the false premise that it is more probable for a woman who contemplates abortion in the early stages of her pregnancy to harm a live child or to not have a plan for the child upon delivery, the State fails to establish a logical connection between Ms. Akers' early consideration of her reproductive right to terminate a pregnancy and the absence of "a plan if the baby was born alive."

Second, the chain of inferences that the State relies upon is too speculative, ambiguous, and equivocal to support an inference that Ms. Akers had the specific intent to kill or harm a live baby, or even that she generally did "not have a plan" if the baby was born alive, simply because she researched abortion options many months prior to delivery. The admission of evidence regarding Ms. Akers' termination searches invited the jury to speculate about, among other things, why she sought this information and why she did not obtain an abortion. The jury was then asked to infer that her reasoning was probative of an intent to kill or harm a human being, or to not have a plan for a baby at delivery many months later, even though many women consider obtaining an abortion for legal and legitimate reasons, none of which make them more likely to formulate an intent to kill or harm a live baby or fail to "have a plan" for a live baby upon delivery many months later.[23]

_____

[23] The Dissent places great emphasis on the relevance of Ms. Akers' general motive—"her desire not to have another child[.]" Dissent Slip Op. at 14. According to the Dissent, the abortion searches provided the jury with insight into her behavior because "[a]ll roads lead back to her desire not to have another child and, consequently, her consideration of and desire to terminate the pregnancy." *Id.* We disagree. Even if the abortion searches were material to a general motive—that Ms. Akers was less likely to want a child—the evidence clearly fails the probative value prong. That Ms. Akers performed abortion searches many months before delivery does not increase the likelihood

37

The jury was also asked to draw unfavorable inferences from the *type of* termination searches—specifically, those related to self-managed abortion—because those methods are more likely to lead to an undetected termination of pregnancy. Neither the *type* of abortion contemplated by Ms. Akers, nor the fact that a self-managed abortion may be less detectable than a clinical one, make it any more probable that she intended to kill or harm a live baby. Self-managed abortions, including the use of medication such as misoprostol or herbal remedies such as rue tea, are common—but misunderstood—practices. Verma & Grossman, *Self-Managed Abortion in the United States*, *supra*, at 71. Moreover, as discussed above, many women search for ways to terminate pregnancies through self-managed care—thereby enabling them to terminate their pregnancies undetected in the privacy of their own homes and for a variety of reasons that are completely unrelated to criminal behavior. Additionally, the studies are replete with evidence that most women consider or experience abortion in secret to avoid societal or familial stigma, and not for any criminal or nefarious reason. *See* note 20, *supra.* Simply put, unless we conclude that a woman who researches abortion options is more likely to kill or harm a living child or to "not have a plan" for a baby at delivery, adding adverse speculative inferences—which themselves are laden with stigma—does not move the relevancy needle.[24]

_____

that she would be motivated to kill or harm a child or even simply to not have a plan for the baby at delivery.

[24] The State argues that this case is unique and seems to acknowledge that the self-help termination searches may lack relevancy in at least *some* circumstances by stating that this case "would present a different appeal indeed" if it involved "the birth of a stillborn baby." The State loses sight of the fact that the defense's theory of the case and presentation of the evidence was that Ms. Akers *did*, in fact, deliver a stillborn. The State

We observe that other state appellate courts have similarly recognized that a woman's contemplation of termination of a pregnancy is not relevant to a specific intent to kill a newborn of the same or different pregnancy. In *Stephenson v. State*, the State of Florida charged a mother with manslaughter from neglect in the death of her 13-month-old daughter. 31 So. 3d 847, 847 (Fla. Dist. Ct. App. 2010). The prosecutor questioned the mother about her considering an abortion and seeking prenatal care late in her pregnancy. *Id.* at 848–49. In closing argument, the prosecutor argued that "[s]he admitted at first she was ambivalent about whether or not she wanted this baby at all." *Id.* at 849. Even though defense counsel did not object to the prosecutor's statements, the Florida appellate court reversed the conviction, explaining that a fundamental error occurred:

> [N]ot only is there no *permissible* relevance to the mother's consideration of abortion to the legal issues at hand, but its only *arguable* relevance makes its admission all the more inappropriate: it is apparently the thought that a person who considers abortion is more likely to have killed the child not aborted. This makes the familiar issue of the admission of prior convictions, which is precluded because the jury may (probably correctly) conclude that one who has been convicted before is guilty now, pale into insignificance. Simply put, the evidence that [the mother], considered aborting her pregnancy did not tend to "prove or disprove a material fact," it tended to prove only a very harmful immaterial one.

asks us to assume the very fact it needed to prove—that Ms. Akers' delivery resulted in a live birth.

Nor are we convinced that this case is unique. Approximately 1 in every 175 births are stillbirths. *Data and Statistics on Stillbirth*, Ctrs. for Disease Control & Prevention (May 15, 2024), https://perma.cc/A4LD-PAL4. In 2018—the year of Ms. Akers' pregnancy—22,459 pregnancies in the United States ended in stillbirths, including 497 in Maryland. *About Fetal Deaths, 2005-2022*, Ctrs. for Disease Control & Prevention, https://perma.cc/P8LQ-MFBQ (last visited Nov. 4, 2024) (choose "Maryland" from maternal residence dropdown and select "2018" from year dropdown; then select "Send"). We envision other instances in which the State would attempt to use evidence pertaining to abortion searches where the pregnancy outcome does not end in a live birth.

39

*Id.* at 851 (citation omitted); *see also Wilkins v. State*, 607 So. 2d 500, 501 (Fla. Dist. Ct. App. 1992) (stating that evidence that the defendant and his wife considered having an abortion of a baby-victim who was born and died later as "excludable . . . as . . . an impermissible assault on the defendant's character and was otherwise irrelevant and inflammatory"); *Minor Child v. State*, 701 S.W.3d 751, 763 (Ark. Ct. App. 2024) (holding that "[e]vidence of planning to terminate a pregnancy is not evidence of planning to abuse a corpse. Whether a person medically induces an abortion is irrelevant to the charges outside that action."); *Bynum v. State*, 546 S.W.3d 533, 542–44 (Ark. Ct. App. 2018) (reversing a conviction for "concealing birth" because the evidence that the defendant sought a prior abortion and took labor-inducing drugs to end the pregnancy early was irrelevant to motive, and its admission was highly prejudicial).[25]

---

[25] Even assuming that the abortion searches were somehow relevant, we disagree with the Dissent's prejudice analysis. Dissent Slip Op. at 19–22. In undertaking its prejudice analysis, the Dissent lumps all of the "abortion evidence" together and concludes generally that this category of evidence did not rise to the level of reversible error. *Id.* We disagree with the Dissent's view that Ms. Akers' termination searches overlapped with or were on par with other evidence that: (1) she and her husband discussed abortion; and (2) a doctor provided her with information pertaining to second-trimester abortions. As discussed *supra*, Ms. Akers searched for information concerning self-managed abortions, which are undertaken by thousands of women per year, but are nonetheless misunderstood and highly stigmatized. Here, the prosecutor leaned into the stigma by emphasizing not only the fact of the abortion searches, but by highlighting their *type*—suggesting that searching for self-managed abortion options was more sinister or morally unacceptable than searching for abortion options performed in a medical or clinical setting. To the extent we could have concluded that the evidence had some relevance, the evidence was highly prejudicial.

We further note that courts in other states have held that admitting abortion evidence is unduly prejudicial and therefore inadmissible. *See, e.g.*, *Billett v. State*, 877 S.W.2d 913, 914–15 (Ark. 1994) (recognizing the controversial nature of abortion and approving of decision not to admit evidence of witness's prior abortions and defendant's condemnation

Finally, the termination searches were not relevant to the collateral issue of Ms. Akers' credibility. She told the detective and social workers at the hospital that she intended to give the baby to a safe haven. That Ms. Akers conducted termination searches months before delivery did not make her safe haven plan less probable. In other words, the fact that Ms. Akers searched for abortion options and elected *not to have* one does not make it less probable that she intended to deliver her child and give it to a safe haven. Nor

---

of her to show bias, where bias had otherwise been shown and "any probative value was clearly outweighed by the danger of unfair prejudice"); *Hudson v. State*, 745 So. 2d 1014, 1016 (Fla. Dist. Ct. App. 1999) (concluding "that the inflammatory evidence of two prior abortions certainly contributed to [the defendant]'s conviction" and thus should not have been admitted); *Wilkins v. State*, 607 So. 2d 500, 501 (Fla. Dist. Ct. App. 1992) (calling evidence that the defendant and his wife considered having an abortion of the baby-victim "excludable . . . as . . . an impermissible assault on the defendant's character" and "otherwise irrelevant and inflammatory"); *Brock v. Wedincamp*, 558 S.E.2d 836, 842–43 (Ga. Ct. App. 2002) (observing "even if evidence of the decedent's abortions and adoptions and sex life were somehow relevant, courts must consider whether 'its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice or of confusing the issues or of misleading the jury'"; the evidence of abortion did not rebut the character of being a good mother) (cleaned up); *People v. Ehlert*, 654 N.E.2d 705, 710 (Ill. App. Ct. 1995), *aff'd*, 811 N.E.2d 620 (Ill. 2004) (finding that the prejudicial effect of evidence about prior abortions and failure to seek prenatal care far outweighed its probative value and that "[a]bortion with all its involvement is a particularly fertile field for preconceived notions and prejudices") (cleaned up); *People v. Morris*, 285 N.W.2d 446, 447–48 (Mich. Ct. App. 1979) (finding that it was reversible error for a trial court to admit evidence of defendant's prior abortions because "[t]he existing strong and opposing attitudes concerning the issue of abortion clearly make any reference thereto potentially very prejudicial"); *Collman v. State*, 7 P.3d 426, 436 (Nev. 2000) (agreeing that information about abortion "was a collateral matter and the minimal value of it was 'overwhelmingly outweighed' by the danger of unfair prejudice, confusing the issues, and misleading the jury"); *Schneider v. Tapfer*, 180 P. 107, 108 (Or. 1919) (testimony that defendant had approved of abortion held irrelevant to issues involved and "was simply evidence which tended to debase and degrade the defendant . . . . [C]ertainly none could have been offered which was more likely to inflame and prejudice the minds of the jury against the defendant"); *Andrews v. Reynolds Mem. Hosp.*, 499 S.E.2d 846, 855 (W.Va. 1997) (evidence of the mother's prior elective abortion was correctly excluded at trial because of the highly prejudicial impact).

did the evidence pertaining to abortion searches that were conducted *prior to* the May 14 obstetrical visit provide a basis upon which to discredit Ms. Akers' statement to the detective that it was too late to have an abortion once she learned she was pregnant. To the extent that the prosecutor attempted to discredit Ms. Akers' statement that it was too late to obtain an abortion, the prosecutor relied upon Dr. Waldrop's testimony and medical records from the May 14 office visit that were admitted into evidence without objection, which reflected that Dr. Waldrop advised Ms. Akers on that day that terminating the pregnancy was still an option.[26]

---

[26] The Dissent sprinkles various relevance hypotheticals throughout its opinion that are completely inapt. Dissent Slip Op. at 2–3, 14 n.8, 15 n.9.

With respect to the Dissent's CEO murder hypothetical, the Dissent attempts to equate our holding on the relevance of Ms. Akers' abortion searches with a prosecutor attempting to admit evidence that a criminal defendant on trial for murdering a CEO of a business attended a rally protesting the business's practices months before the murder. *Id.* at 2–3. The Dissent believes that this is an apt analogy because the predicate conduct— conducting abortion searches and attending a rally—is constitutionally protected. The Dissent is wrong. Although we note in this opinion that Ms. Akers engaged in constitutionally protected activity, that protection is not what makes this evidence irrelevant.

The Dissent's next hypothetical asks the reader to imagine that Mr. Akers engaged in the internet searches instead of Ms. Akers. *Id.* at 14 n.8. Once again, the Dissent misses the mark. The searches would not become relevant simply because Mr. Akers undertook them instead of Ms. Akers. Other courts have reached a similar conclusion. *See Wilkins*, 607 So. 2d at 501 (stating that evidence that the defendant and his wife considered having an abortion of a baby-victim who was born and died later as "excludable . . . as . . . an impermissible assault on the defendant's character and was otherwise irrelevant and inflammatory"). Of course, if Mr. Akers was surreptitiously researching "rue tea" or other substances in circumstances suggesting that he may have intended to cause Ms. Akers to ingest them without her knowledge or consent, that would be an entirely different hypothetical, and our holding in this case would have no application to the facts of that case.

# V

We turn to the second issue in this case—whether evidence that Ms. Akers did not receive prenatal care was relevant, and, if relevant, whether the evidence was unduly prejudicial. Ms. Akers asserts that, like abortion searches, a woman's forgoing of prenatal care is not probative of an intent to kill a person, nor does it reflect on one's obligation to provide medical care after birth for a living baby if such care becomes necessary. Nor, according to Ms. Akers, is a lack of prenatal care impeachment evidence of a woman's plan for adoption. Ms. Akers further asserts that even if such evidence was minimally

---

The Dissent's hypothetical attempting to equate Ms. Akers' abortion searches with evidence that Ms. Akers "expressed unbridled joy that a third child was on the way" to establish her state of mind in a murder trial, *see* Dissent Slip Op. at 14 n.8, is simply inapposite to the evidence presented in this case and our analysis of the same. As our case law clearly reflects, the relevancy inquiry undertaken in each case is dependent upon the facts, the party's assertions of the basis of relevance, and other factors, including how speculative, ambiguous, and equivocal the inferential links are in a chain of inferences. *See, e.g.*, *Fuentes v. State*, 454 Md. 296, 326 (2017); *Snyder v. State*, 361 Md. 580, 596 (2000); *Vitek v. State*, 295 Md. 35, 40–42 (1982). For the reasons set forth herein, the abortion searches fail to meet the basic relevancy threshold. Whether hypothetical statements made by Ms. Akers to a third party in which she expressed joy about a pregnancy would satisfy a relevancy inquiry is not before us, nor would our holding in this case address such a hypothetical.

Finally, we similarly conclude that the relevancy inquiry in this case is not analogous to the Dissent's hypothetical about a bank robber wearing a red shirt. *See* Dissent Slip Op. at 15 n.9. Such a hypothetical does not involve the same speculative and ambiguous chain of inferences present here. Again, unless one assumes that a woman who researches abortion early in her pregnancy is more likely to harm or not have a plan for a live baby many months later upon a baby's delivery, it is simply not relevant.

43

probative of any material fact, it is prejudicial because it triggers unconscious biases that shape the inferences that a person draws about a woman who forgoes prenatal care.

The State asserts that a failure to obtain prenatal care was relevant in the context of the "unique facts" of this case, namely, that the evidence related to the *disparate* prenatal care between Ms. Akers' first two pregnancies and this one. Although the State made a general relevancy argument with respect to Ms. Akers' lack of prenatal care in the Appellate Court, [27] the State did not argue the relevance of *disparate* prenatal care at any time prior to its brief in this Court—that characterization of the evidence made its debut in the Appellate Court's opinion. Before us, the State points out that Ms. Akers obtained prenatal care for her pregnancies for her two children prior to this pregnancy, but she did not do so with this pregnancy. The State asserts that the evidence of disparate prenatal care between Ms. Akers' pregnancies with her two children and this one tended to show that Ms. Akers did not want another child, did not make plans for his arrival, and intended to kill him if he was born alive. Before turning to the parties' contentions, we make a few observations.

First, there is no statutory obligation for a woman to seek obstetrical care, and a woman's forgoing of prenatal care is not a crime in Maryland. *See generally* CR § 2-103(f) (prohibiting the application of the murder or manslaughter of a viable fetus offense to a pregnant woman's act or failure to act).

---

[27] As discussed *supra*, the prosecutor did not make any relevancy argument with respect to the prenatal care during the arguments pertaining to Ms. Akers' motion to exclude this evidence, and the State did not comment on Ms. Akers' lack of prenatal care during opening or closing arguments.

44

Second, we find instructive this Court's comments in *Kilmon*, when the Court rejected the State's statutory interpretation of the reckless endangerment statute as applying to a woman who was accused of ingesting cocaine while pregnant. 394 Md. at 170. In rejecting the State's statutory interpretation in that instance, we observed that it could quickly lead to the policing of pregnant women through the criminalization of a "whole host of intentional and conceivably reckless activity" that could be considered harmful or reckless behavior, including:

> consuming alcoholic beverages to excess, to smoking, to not maintaining a proper and sufficient diet, to *avoiding proper and available prenatal medical care*, to failing to wear a seat belt while driving, to violating other traffic laws in ways that create a substantial risk of producing or exacerbating personal injury to her child, to exercising too much or too little, indeed to engaging in virtually any injury-prone activity that, should any injury occur, might reasonably be expected to endanger the life or safety of the child. Such ordinary things as skiing or horseback riding could produce criminal liability.

*Id.* at 177–78 (emphasis added). We cautioned that "[i]f the State's position were to prevail, there would seem to be no clear basis for categorically excluding any of those activities from the ambit of the statute" and that "criminal liability would depend almost entirely on how aggressive, inventive, and persuasive any particular prosecutor might be." *Id.* at 178.

Third, the unfortunate reality is that forgoing obstetrical care is not uncommon. Prenatal care is not equally available to all women in this country. Persons of color, persons with low-income, and persons living in rural areas are more likely to lack access to obstetrical care. Rachel Treisman, *Millions of Americans are Losing Access to Maternal Care. Here's What Can be Done*, Minn. Pub. Radio News (Oct. 12, 2022), *available at*

45

https://perma.cc/LR8Z-LG6M.  In Maryland, in 2021, 16.5% of women in Maryland received no or inadequate prenatal care.  *See* Jazmin Fontenote et al, March of Dimes, *Where You Live Matters: Maternity Care Deserts and the Crisis of Access and Equity in Maryland* 1, 3 (2023).  A woman who does not obtain prenatal care may be the subject of improper gender stereotypes and implicit biases arising out of societal views on how a pregnant woman should act.  With these observations in mind, we turn to the evidence and arguments presented here.

We hold that evidence that a woman has forgone prenatal care, by itself, is ordinarily irrelevant to an intent to kill or harm a live baby at birth.  It is too ambiguous, speculative, and equivocal to infer that a woman who forgoes prenatal care while pregnant is more likely to kill or harm a live human being.  Women forgo prenatal care for a host of reasons that do not involve criminal conduct.

With respect to the State's argument pertaining to the *disparate* prenatal care, although we are not comfortable holding that evidence of disparate prenatal care would never be relevant to any material issue in any case, given that this issue was not raised before the trial court, we will not address it further in the context of the evidence presented at Ms. Akers' trial.

Before leaving this topic, we reiterate the concern we expressed in *Kilmon* over the potential for state policing and prosecution of pregnant women for their conduct, including drawing incriminating inferences from said conduct.  Moreover, even if minimally probative, the unfair prejudicial effect of such evidence may exceed any minimal probative value.  Given the frequency with which women forgo prenatal care or receive inadequate

46

prenatal care—which can be influenced by a variety of socioeconomic factors—and the stigma and gender stereotypes occasioned by the admissibility of this type of evidence, a trial judge should examine the evidence very closely, including the reasons for its admissibility as well as any adverse immaterial inferences arising from gender stereotypes and implicit biases, and carefully weigh any probative value against the potential prejudicial and inflammatory effects.

## VI

In conclusion, we hold that the evidence that Ms. Akers contemplated terminating her pregnancy by conducting internet searches between six and nearly eight months prior to delivery was irrelevant, and therefore inadmissible. The termination searches were not probative of motive or intent to kill or harm a child. The predicate fact—lawfully contemplating the termination of a pregnancy—does not support the inferences advanced by the State—an intent, plan, or motive to kill or harm a person.

We similarly hold that, on these facts, evidence of Ms. Akers' bare decision to forgo prenatal care was not probative of motive or intent to kill or harm a live child. Women forgo prenatal care for a variety of reasons, and without more, the failure to obtain such care is too speculative, ambiguous, and equivocal to support an inference that a woman would be more likely to harm a live child or prevent a live child's access to medical care if such care was necessary. To the extent that the State has argued before this Court that Ms. Akers' *disparate* prenatal care is relevant, given that this argument has been made for the first time before this Court, we decline to address it. Although we cannot say that a lack of prenatal care will never be relevant to any material issue, when presented with such

47

evidence, a trial judge should examine the evidence very closely, including the reasons that the State seeks its admission, as well as any adverse immaterial inferences arising from gender stereotypes and implicit biases, and carefully weigh any probative value against the potential prejudicial and inflammatory effects.

We therefore reverse the judgment of the Appellate Court with instructions to that court to remand this case to the circuit court for a new trial.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY HOWARD COUNTY.**

Circuit Court for Howard County
Case No. C-13-CR-19-000367

Argued: September 9, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 7

September Term, 2024

_____

MOIRA E. AKERS

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed:  February 19, 2025

Respectfully, I concur. I join the majority opinion with the exception of footnote 11 on pages 18-19. I agree with the majority opinion's holdings that Ms. Akers's internet searches about terminating a pregnancy during a period in which she would be able to legally obtain an abortion in Maryland are not relevant and that Ms. Akers's "bare decision to forgo prenatal care was not probative of motive or an intent to kill or harm a live child." Maj. Slip Op. at 1-2. I do not join the Majority's discussion in footnote 11, however, concerning the standard of review for the determination of whether evidence is relevant.

Over the course of 17 years, this Court has concluded that a trial court's determination as to relevancy is reviewed de novo, *i.e.*, that the standard of review for a decision concerning whether evidence is relevant is the de novo standard of review. See, e.g., DeLeon v. State, 407 Md. 16, 20, 962 A.2d 383, 385 (2008) ("The determination of whether evidence is relevant is a matter of law, to be reviewed *de novo* by an appellate court." (Citation omitted)); Williams v. State, 457 Md. 551, 563, 179 A.3d 1006, 1013 (2018) ("When the circuit court determines whether a piece of evidence is relevant, that is a legal conclusion, which is reviewed without deference."). Recognizing that not all relevant evidence is admissible, we have determined that the standard of review for the admissibility of relevant evidence is the abuse of discretion standard. See, e.g., Williams, 457 Md. at 563, 179 A.3d at 1013 ("However, the circuit court's decision to admit relevant evidence is reviewed for an abuse of discretion.").

In response to the Dissent, however, with the discussion of the standard of review for a relevancy determination in footnote 11, the Majority weighs in on a matter that it acknowledges was not raised by either party and is not necessary to be addressed for the

resolution of the case.[1]  Since at least 2008, this Court has concluded that the standard of review for a determination of relevancy is de novo with respect to the issue of whether the proposed evidence is relevant.  See DeLeon, 407 Md. at 20, 962 A.2d at 385.  This conclusion has been adopted in other cases, such as Fuentes v. State, 454 Md. 296, 325, 164 A.3d 265, 282 (2017), and Hall v. State, 214 Md. App. 208, 227, 75 A.3d 1055, 1066 (2013).  The conclusion was not one that was reached casually.  The consciousness of the Court's commitment to the de novo standard of review is demonstrated by the circumstances involved in the issuance of the opinion in Williams, 457 Md. 551, 179 A.3d 1006.  The Williams opinion was initially issued with language indicating that the standard of review for a determination of relevance was an abuse of discretion standard.  The Office of the Public Defender filed a motion for reconsideration, which was granted.  This Court revised the Williams opinion and reissued it, describing the standard of review as follows:

> Interpretation of the Maryland Rules presents a question of law, and

[1]In a three-page footnote, the Dissent contends that there are "legitimate arguments" supporting what it characterizes as "three [] standards of review this Court has applied to relevance determinations over the years" and that the standard of review for a relevance determination should be the abuse of discretion standard.  Dissent Slip Op. at 16-19 n.10.  The Dissent disapproves of case law of this Court establishing the standard of review as de novo and, by its own admission, makes an issue of something that is not before the Court.  See Dissent Slip Op. at 18 n.10   In the end, the Dissent concludes that the Majority is correct that neither party has asked this Court to resolve "the tension in our case law on this issue."  Dissent Slip Op. at 18 n.10.   In my view, not every argument raised in a dissenting opinion requires a response, let alone one that appears to validate the Dissent's point of view.  This is particularly the case where the Dissent on its own initiative challenges the validity of prior case law of this Court as resting on "shaky ground[,]" where neither party has done so.  Dissent Slip Op. at 17 n.10.  I cannot join the Majority's discussion in footnote 11 which leans into the Dissent's position that there is an issue with or tension in this Court's case law concerning the de novo standard of review for relevance determinations.

are thus reviewed *de novo* to ascertain whether the trial court was legally correct in its rulings. *State v. Graves*, 447 Md. 230, 240, 135 A.3d 376, 382 (2016); *Lisy Corp. v. McCormick & Co.*, 445 Md. 213, 221, 126 A.3d 55, 60 (2015); *Williams v. State*, 435 Md. 474, 483, 79 A.3d 931, 936 (2013); *State v. Daughtry*, 419 Md. 35, 46, 18 A.3d 60, 67 (2011); *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 62, 5 A.3d 45, 55 (2010); *Khalifa v. Shannon*, 404 Md. 107, 142, 945 A.2d 1244, 1264 (2008); *Gray v. State*, 388 Md. 366, 375, 879 A.2d 1064, 1068 (2005); *Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004). *See Cole v. State*, 378 Md. 42, 56, 835 A.2d 600, 607 (2003) (observing that the application of the Maryland Rules to a particular situation is a question of law reviewed *de novo*). When the circuit court determines whether a piece of evidence is relevant, that is a legal conclusion, which is reviewed without deference. However, the circuit court's decision to admit relevant evidence is reviewed for an abuse of discretion. An abuse of discretion occurs where no reasonable person would take the view adopted by the circuit court. *Fuentes v. State*, 454 Md. 296, 325, 164 A.3d 265, 282 (2017); *Alexis v. State*, 437 Md. 457, 478, 87 A.3d 1243, 1254 (2014). Therefore, we interpret the Maryland Rules *de novo*, and review the trial judge's admissibility determinations for an abuse of discretion.

Id. at 562-63, 179 A.3d at 1012-13. These circumstances demonstrate that there is no tension with respect to the Court's view as to the standard of review for a relevancy determination.

Nonetheless, in response to comments by the Dissent, the Majority states: "To the extent that statements in earlier cases are inconsistent with statements in more recent cases concerning the de novo standard of review, that issue has not been briefed or raised by any party." Maj. Slip Op. at 19 n.11. The Majority refers to our case law establishing that the standard of review for relevancy is de novo as "our repeated assertion that the standard of review is de novo[.]" Maj. Slip. Op. at 19 n.11. Rather than confirm that the standard of review for relevancy is de novo, the Majority injects uncertainty into the area and, in the process, undermines settled case law. Unlike the Majority, I would not characterize the cases that use the de novo standard of review as having existed for just over "the past

- 3 -

several years" or as merely being "more recent cases" when <u>DeLeon</u> was issued 17 years ago. Maj. Slip. Op. at 18-19 n.11. Nor would I imply that there is an issue with respect to the standard of review for relevancy or refer to our case law concerning the de novo standard of review as a repeated assertion.

The parties in this case did not raise an issue as to the applicable standard of review or indicate that there was any discrepancy with respect to the standard. On brief, in describing the applicable standard of review, Petitioner stated that appellate courts review de novo a trial court's determination as to whether evidence is relevant. For its part, the State urged this Court to reject case law relied upon by Petitioner for the proposition that the termination inquiry evidence at issue was not relevant and deem the disputed evidence to be relevant. In reviewing the relevancy determination, the Majority could have simply applied the de novo standard of review, which is not in dispute.

Instead, the Majority engages in a discussion indicating that to the extent that "earlier cases" may be inconsistent with "more recent cases[,]" giving the impression that there is credence to the Dissent's view that the standard of review is uncertain, but ultimately concludes that under either standard of review the outcome of the case would be the same. In doing so, the Majority characterizes cases that use the de novo standard of review as having existed for just over "the past several years" or as being "more recent cases[,]" states that the "issue has not been briefed or raised[,]" and refers to case law establishing that the standard of review is de novo as "our repeated assertion[.]" All of this, albeit inadvertently, perhaps, creates needless uncertainty and weakens case law concerning the de novo standard of review for relevancy, when neither party has indicated

- 4 -

that there is an issue.

Typically, this Court does not on its own with no controversy at issue undermine our case law. Appellate courts do not generally, without request, look back and imply that cases previously decided by the Court were decided wrongly. In this case, in response to the Dissent, the Majority has done so, calling into question case law that has established that the standard of review for a relevancy determination is de novo, rather than simply reaffirming the established standard.

So, while I join the majority opinion's holding in this case, I do not join its discussion of the standard of review for relevancy in footnote 11 on pages 18-19.

Circuit Court for Howard County
Case No. C-13-CR-19-000367
Argued: September 9, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 7

September Term, 2024

_____

MOIRA E. AKERS

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Dissenting Opinion by Gould, J.,
which Biran, J., joins.

_____


Filed: February 19, 2025

Motive is a relevant issue in a murder case, and no less so when the victim is a newborn baby. Evidence of a motive is, therefore, relevant under Maryland Rule 5-401. Here, the jury determined that Ms. Akers' baby was born alive, and that Ms. Akers caused her baby's death. With those two findings in hand, the jury had to determine Ms. Akers' state of mind. Whether Ms. Akers would be convicted of first-degree murder, second-degree murder, or involuntary manslaughter hung in the balance.

A strong desire not to have another child—one that lasts from the beginning of the pregnancy until the moment of birth—is a motive to kill a newborn. Not wanting another child is also a reason to have an abortion. If a pregnant woman does not want another child, both an abortion and killing the newborn are means to the same end, albeit radically different means with different legal implications. When the abortion option is no longer available, *and* the pregnant woman perceives a continuing need to keep her pregnancy secret from everyone, including her husband, *and* she perceives no viable alternative due to real or perceived stigmas and disapproval by family members, then killing the baby immediately upon its birth becomes more probable. This is particularly so where the pregnant mother's hope that the pregnancy will terminate on its own—abetted by the conscious decision to forgo prenatal care—is dashed.

To determine Ms. Akers' state of mind on November 1, 2018, all the facts and circumstances that led to her actions that day are relevant, including her contemplation of an abortion, her and her husband's joint desire for her to get an abortion, her failure to get an abortion, her lie to her husband that the pregnancy was ectopic and had terminated, her internet searches relating to self-help pregnancy termination, her need for secrecy, her

decision to forgo prenatal care, and her refusal to get help when she went into labor and her water broke. Those facts and circumstances led to the decisions Ms. Akers made on that fateful day.

Not so says the Majority. According to the Majority, evidence that Ms. Akers contemplated an abortion is not relevant "unless one assumes that a person who researches abortion options is more likely to commit murder[.]" Maj. Op. at 35. As the Majority sees it, Rule 5-401 demands that, to be relevant, a piece of evidence must have a predictive quality to it; here, that conducting research on abortions portends or indicates a proclivity for murder.

The flaw in this logic is obvious when applied in a different context. Suppose the CEO of a major corporation is shot and killed. Based on a suspect's resemblance to a surveillance photo as well as his possession of a firearm of the type that was used in the killing, that suspect is arrested and charged with the murder. Later, it is discovered that six months before the killing, the accused attended a demonstration protesting the corporation's business practices. The prosecution seeks to admit evidence that the accused attended the demonstration. Attending a demonstration criticizing a corporation does not make a person more likely to murder its CEO. But it does go to motive and would be relevant under Rule 5-401, notwithstanding any First Amendment implications. Under the

2

Majority's logic, however, a Maryland trial court would be constrained to exclude such evidence.[1]

To find that the abortion evidence was relevant to Ms. Akers' state of mind, one need not equate abortion to murder, put it on the same moral plane as murder, or find that considering an abortion indicates a proclivity to commit murder. Nor does a finding that such evidence was relevant undermine, in any way, the protected status in Maryland of a woman's right to choose.[2] This appeal is about a simple application of Rule 5-401. Here, the trial court correctly applied this rule and the Appellate Court of Maryland, in a thoughtful and measured opinion, properly affirmed.

Accordingly, I respectfully dissent.

I

Under Maryland Rule 5-401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This rule

---

[1] The Majority states that I believe "this is an apt analogy because the predicate conduct—conducting abortion searches and attending a rally—is constitutionally protected." Maj. Op. at 42 n.26. The Majority certainly emphasized the protected status of a woman's right to choose both now and when the events in this case occurred, so it seems fitting to include a hypothetical that implicates other constitutionally protected rights. But the purpose of this analogy is only, as stated at the outset, to illustrate the flaw in the Majority's articulation of the appropriate relevance test.

[2] Regardless of the outcome here, by statute, Ms. Akers and every other woman in Maryland will remain free to terminate a pregnancy without the State's interference before viability, or at any time thereafter if there is a risk to her life or if the fetus has a serious deformity. MD. CODE ANN., HEALTH-GEN. § 20-209 (2023 Repl. Vol., 2024 Supp.). And a woman's right to an abortion is now protected by the Maryland Declaration of Rights. MD. CONST. DECL. OF RTS. art. 48.

3

sets a "very low bar" for relevance. *Williams v. State*, 457 Md. 551, 564 (2018) (citing *State v. Simms*, 420 Md. 705, 727 (2011)). As this Court, quoting *McCormick on Evidence* verbatim, explained:

> Under our system, molded by the tradition of jury trial[s] and predominantly oral proof, a party offers his evidence not *en masse*, but item by item. An item of evidence, being but a single link in the chain [of] proof, need not prove conclusively the proposition for which it is offered. It need not ever make that proposition appear more probable than not. Whether the entire body of one party's evidence is sufficient to go to the jury is one question. Whether a particular item of evidence is relevant to his case is quite another. It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. *Thus, the common objection that the inference for which the fact is offered 'does not necessarily follow' is untenable*, [as] it poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

*Smith v. State*, 423 Md. 573, 590-91 (2011) (quoting 1 *McCormick on Evidence* § 185 (4th ed. 1992)). Thus, "[r]elevance is a relational concept," so a piece of evidence must be related logically to a matter at issue in the case. *Snyder v. State*, 361 Md. 580, 591 (2000). Individual details should not be considered separately. *Spector v. State*, 289 Md. 407, 434 (1981). And, standing alone, each piece of evidence does not have to meet a party's burden of proof. *Snyder*, 361 Md. at 591.

There are two aspects to relevance: materiality and probative value. *Smith*, 423 Md. at 590. "Materiality looks to the relation between the proposition for which the evidence is offered and the issues in the case[,]" and "[p]robative value is 'the tendency of evidence to establish the proposition that it is offered to prove.'" *Id.* (quoting 1 *McCormick on Evidence* § 185). In Rule 5-401, the materiality prong is reflected in the phrase "any fact that is of

consequence to the determination of the action[.]" *Id.* (quoting Md. R. 5-401); *see also* 5 *Maryland Evidence, State & Federal* § 401:1 (2024); Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 501 (4th ed. 2010) ("Maryland Rule 5-401, like Rule 401 of the Federal Rules of Evidence, uses the term 'of consequence' to deal with the concept of materiality."). A fact is material if its resolution will "somehow affect the outcome of the case." *King v. Bankerd*, 303 Md. 98, 111 (1985). "Substantive law dictates whether a particular issue is or is not (in the words of Rule 5-401) 'of consequence to the determination of the action.'" Murphy, *Maryland Evidence Handbook* § 501. As explained below, when determining the defendant's state of mind in a murder case, the jury may properly consider whether the defendant had a motive to kill. The existence or absence of a motive is, therefore, a "fact that is of consequence" in a murder case.

*McCormick* offers two ways to think about probative value. In doing so, he uses *E* to denote the evidence, and the fact or consequence that the evidence is offered to establish, which is called the "hypothesis," is denoted by *H*. The first way is to "simply ask 'Does learning of this evidence make it either more or less likely that the disputed fact is true?'" 1 *McCormick on Evidence* § 185 (8th ed. 2022). Put another way, the test can be framed as whether the "probability of the hypothesis *H* given the evidence *E* is less than the probability of *H* without considering *E*." *Id. McCormick* illustrates this test with a hypothetical defendant charged with assaulting his neighbor who wants to introduce evidence of his reputation for being nonviolent. *Id. McCormick* explains: "Knowing that someone has this reputation seems to make it less likely that he would commit an assault, presumably because we accept the underlying generalization that a smaller proportion of

people with a reputation for nonviolence assault their neighbors than is the case for people generally." *Id.*

This first way of thinking about probative value seems to be the approach the Majority applies here. In *McCormick*'s terms, the Majority seems to be saying something like this: "Knowing that Ms. Akers conducted internet research on self-managed abortions early in her pregnancy does not make it more likely that she would kill her baby immediately upon its birth than if she had not conducted such research."

But there is a drawback to this approach, as explained by *McCormick*:

> Sometimes, however, this direct mode of reasoning about the probability of an hypothesis will be more difficult to apply because the effect of *E* on the probability of *H* will not be so apparent. A second approach considers the probability of the evidence given the hypothesis, $P(E \mid H)$. Evidence that is more likely to arise when *H* is true than when *H* is not true supports *H*; evidence that is less likely to arise under *H* than not-*H* supports not-*H*. Evidence of either type is probative of *H*. But evidence that is just as likely to arise when *H* is true as when *H* is false is of no use in deciding between *H* and not-*H*—and is irrelevant.

*Id.* (footnotes omitted). Using a hypothetical assault charge to illustrate this approach, *McCormick* explains that "it seems less probable that a person who committed the assault would have such a reputation than that a person who did not commit the assault." *Id.* This is the approach that is appropriate here; I will return to it and apply it below.

A

The State charged Ms. Akers with first-degree murder, two counts of second-degree murder, involuntary manslaughter, and first-degree child abuse. For each of the homicide charges, the jury was instructed that the State had to prove that "Baby Akers was born alive," and that Ms. Akers "caused the death of Baby Akers." The State won the battle of

6

the experts on the first issue, as the jury determined that Ms. Akers' baby was, in fact, born alive. The jury also credited Ms. Akers' account of what she did with the baby upon his birth in determining that she caused her baby's death.[3] Without those two threshold findings, the jury would not have even reached the issue of Ms. Akers' state of mind. Thus, our consideration of how the jurors could have reasonably assessed the evidence regarding her state of mind should be analyzed against the backdrop of these two threshold jury findings. *See State v. Jones*, 311 Md. 23, 34 n.6 (1987) ("The threshold findings of the trial judge on questions of admissibility are not communicated to the jury, and the jury is of course free to make its own determination concerning relevance.").

As noted above, whether Ms. Akers would be convicted of first-degree murder, second-degree murder, or involuntary manslaughter hinged on the jury's determination of her state of mind. The jury was instructed that (1) first-degree murder required a finding that Ms. Akers' actions were "willful, deliberate, and premeditated"; (2) second-degree murder required a finding that Ms. Akers engaged in deadly conduct with intent to kill or to inflict serious bodily harm that death would be the likely result; and (3) involuntary manslaughter required a finding that Ms. Akers acted negligently.

Intent is usually proven with circumstantial evidence; thus, intent to murder "may be inferred from all the facts and circumstances of the occurrence." *Davis v. State*, 204 Md. 44, 51 (1954). When intent is an issue, "any fact which supplies a motive for such act . . .

---

[3] Put in terms of *McCormick*'s second way of thinking about relevance: We start with the premise that the hypothesis—that Ms. Akers killed her baby—is true.

7

is admissible.”[4] *Meyerson v. State*, 181 Md. 105, 109 (1942) (internal quotations omitted) (quoting *Bevans v. State*, 180 Md. 443, 447 (1942)). Motive is “the catalyst that provides the reason for a person to engage in criminal activity.” *Wallace v. State*, 475 Md. 639, 672 (2021) (internal quotations omitted) (quoting *Snyder*, 361 Md. at 604). Again, put in the parlance of Rule 5-401, as a matter of law, whether the defendant had a motive to kill is a “fact that is of consequence to the determination of the action” in a murder case.

B

With the foregoing principles in mind, I turn now to the facts of this case to demonstrate that the disputed evidence is relevant under Rule 5-401.

Ms. Akers’ actions on November 1 did not occur in a vacuum. They occurred after a nine-month pregnancy characterized by fear, denial, and secrecy. A reasonable juror would want to consider how and why Ms. Akers found herself in such tragic circumstances and acted as she did on November 1. The short explanation for her predicament came from Ms. Akers in her statement to Detective Weigman: Once her pregnancy was confirmed,

---

[4] The trial court instructed the jury that “state of mind . . . ordinarily cannot be proven directly” and therefore “intent may be shown by surrounding circumstances.” Further, the court told the jury that it “may consider the defendant’s acts and statements, as well as the surrounding circumstances.” The court also instructed the jury that “motive is not an element of the crime charged and need not be proven[,]” but it may nevertheless “consider the motive or lack of motive as a circumstance in this case.” The court added that “[p]resence of motive may be evidence of guilt” and “absence of motive may suggest innocence.”

she "was too far along" to get an abortion.[5] That statement alone connects the evidence that she researched, considered, and wanted an abortion, to the events on November 1.

The evidence, viewed in the light most favorable to the State, bears this out.[6] Ms. Akers became pregnant in January or February of 2018. Already a mother of two young children, Ms. Akers knew from the beginning of her pregnancy that she did not want to carry her baby to term. She first conducted her pregnancy termination research in early March, when she presumably only suspected she might be pregnant. Specifically, on March 4, 2018, Ms. Akers visited an eBay webpage for Misoprostol and an article titled "Women Resort to Over-the-Counter Remedies to End Pregnancies in WaHi" on a website called DNAinfo. That same day, Ms. Akers performed several searches regarding abortion and miscarriage: "over the counter pills that cause miscarriage"; "does rue extract cause you to miscarry"; and "rue tea for abortion." A few days later, on March 8, Ms. Akers searched "miscarriage at 7 weeks" and "miscarriage at 7 weeks do i [sic] need a d&c."

Ms. Akers tested positive on a pregnancy test in May. That month she searched "how to end a [sic] ectopic pregnancy" and various OB/GYN offices.

---

[5] That she may not have been "too far long" is not the relevant point here. What's important is that the jury was entitled to credit that statement as an indication of what Ms. Akers honestly *believed* when she left the doctor's office on May 14, 2018.

[6] Although Ms. Akers did not testify, she gave a statement to Detective Weigman and spoke to Dr. Carol Goundry, the OB/GYN who treated her at Howard County General Hospital, and Alison Tiedke, a perinatal social worker at the hospital, both of whom testified at trial. In addition, the medical records from Ms. Akers' May 14, 2018 visit with her OB/GYN, Dr. Danielle Waldrop, were admitted into evidence and were the subject of Dr. Waldrop's live testimony. The medical records from her hospital stay from November 1 through November 3 were also admitted. The account that follows is derived from those sources.

Ms. Akers explained that she and her husband "could not provide" a "good life" for a third child and that, "emotionally," she was "kind of at it" with her two children. She explained that she "know[s] [her] limits" and that she and her husband "wanted to focus on the . . . two kids." Ms. Akers explained that "both her and her husband felt that this is not a good time for them to have another child" and decided she would get an abortion.

Ms. Akers had an OB/GYN appointment with Dr. Danielle Waldrop on May 14, 2018. There, her pregnancy was confirmed. According to the medical records from that visit, Dr. Waldrop estimated that Ms. Akers was eleven weeks along in her pregnancy. Ms. Akers explained to Dr. Waldrop that she wanted to terminate the pregnancy. Ms. Akers became very emotional, cried repeatedly, and was not able to finish her medical exam. Ms. Akers described it as a panic attack. She was given information for local clinics that perform second-trimester abortions. Ms. Akers left the appointment believing—rightly or wrongly—that she was fifteen weeks along and that it was too late to terminate her pregnancy.

Ms. Akers told her husband that her pregnancy was ectopic and that she "took care" of it. Fearing disapproval, she did not want her Catholic family to know about her pregnancy or that she contemplated having an abortion or giving the baby up for adoption. Hence, her need for complete secrecy.

Thereafter, Ms. Akers hoped the pregnancy would go away on its own and remained in a state of denial. She admitted that she "almost kept hoping that something would happen" so that it would go away. In contrast to the pregnancies for her two children, and in line with her hope that the pregnancy would just go away, Ms. Akers neither sought nor

10

received prenatal care. She feared that if she got prenatal care then everybody would know that she was pregnant.

On the night of October 31, Ms. Akers started having contractions and got little to no sleep. The contractions continued into the next morning, November 1. That morning, she helped her five-year-old son get ready for school. Her husband took him to the bus stop, leaving her with their two-and-a-half-year-old daughter. Around 8:30 a.m., Ms. Akers, suffering from stomach pain, took a bath while her husband watched a movie with their daughter. She later joined them. Ms. Akers put her daughter down for a nap around noon. Ms. Akers then laid down on her bed because the contractions were getting heavier.

Her water soon broke, but she did not seek any medical care or call 911 "[b]ecause then I figured that everybody would kind of find out and I wouldn't . . . [b]e able to go through, just my plan of, um, taking the baby to just the fire house."[7] The contractions continued to become more severe. She tried to deliver the baby, but she felt like she had to go to the bathroom. She went to the bathroom and was there for a long time. Her husband knocked to see if she was okay, and then went to the bus stop to pick up their son.

Ms. Akers gave birth and delivered the baby into the toilet. She grabbed the towel sitting on the bathtub. She claims she did not hear any noises from the baby and then took the baby with the towel into her bedroom. Ms. Akers cut the umbilical cord with a pair of scissors. She then put "everything," meaning the baby wrapped in a towel, into a plastic

---

[7] This was a curious explanation that might have caught the jury's attention because, unless she planned to bring a deceased newborn to the firehouse, it cannot be squared with her statement to Detective Weigman that she had assumed the baby had died in utero when, according to Ms. Akers, the baby had stopped moving a few days earlier.

bag that she had "from putting away baby clothes." She put the bag into the closet and shut the closet door. She gave no thought about what she would do with the baby after she put him in the closet. She did not even check to see if the baby was a boy or a girl. She stated that she "didn't really look at the baby that closely[.]" "Yeah, I just grabbed it and grabbed him, or I didn't even look at the thing." She later learned from others that the baby was a boy.

Ms. Akers explained that she did nothing to try to save the baby because "the baby hadn't been moving for a couple days at the point, inside. . . . [S]o I assumed it was just, it had already passed." She did not seek help at that time, explaining that "since I was so close to my due date, that it would, I would go into labor and I'd be able to um, kind of deal with it at that point." Even though she said that the baby had stopped kicking several days earlier, she made no plan for what to do once she delivered what she claims to have thought was a stillborn baby.

She started to clean up the blood, noting that she was "bleeding a lot[.]" Her husband returned home and found her cleaning up. He called 911, and the paramedics came and took her to the hospital. At first, Ms. Akers attempted to conceal from the hospital staff that she had just given birth, but eventually admitted that she had delivered a baby at home and told doctors that the baby was in a plastic bag in a closet. In the hospital waiting area, detectives told Mr. Akers that his wife had delivered a baby. Until that moment, Mr. Akers had believed that the pregnancy had been terminated back in May.

12

C

At the risk of understatement, these were not run-of-the-mill circumstances of an at-home birth. Reasonable jurors would want to consider how and why Ms. Akers found herself in such tragic circumstances on November 1, and to do that, each link in the evidentiary chain was important. To understand why Ms. Akers acted as she did on November 1 the jury had to understand her need for secrecy throughout her pregnancy and how that need limited her available options that day. To keep her pregnancy secret, Ms. Akers lied to her husband and declined to get prenatal care. On November 1, she refused to get help as her labor progressed and her water broke, even though her husband was home and could have helped her. Ms. Akers continued to keep the secret after she delivered the baby—the baby that the jury determined was born alive and whose death she caused. Given the lengths she went to protect her secret, it is not a stretch to conclude that she was not going to walk through her house with her husband and children at home, baby in hand, to make her way to the car and then drive to the firehouse. In sum, the jury reasonably could have concluded that Ms. Akers' need for secrecy drove the choices she made on November 1.

Evidence that explains facts already in evidence is relevant and admissible. *Aravanis v. Eisenberg*, 237 Md. 242, 262 (1965). Here, to understand Ms. Akers' need for secrecy, the jury needed to know why she lied to her husband in the first place. From the evidence admitted at trial, three related reasons come to mind: (1) she and her husband decided for various reasons not to have a third child, and therefore she would get an abortion; (2) by the time her pregnancy was confirmed, she believed that it was too late to

13

get an abortion; and (3) Ms. Akers did not want to disappoint or upset her husband with the news that it was too late to terminate the pregnancy. In sum, although the mere consideration of an abortion does not indicate a proclivity for killing the baby when it is born, it can, and here did, provide evidence of a motive for Ms. Akers who, according to the jury, gave birth to a live baby, knew the baby was alive, and then caused the baby's death. All roads lead back to her desire not to have another child and, consequently, her consideration of and desire to terminate the pregnancy.[8] Such evidence meets the low bar

---

[8] Under the Majority's reasoning, if Ms. Akers had a friend who could testify that she spoke to Ms. Akers regularly between March and May and during those conversations, Ms. Akers expressed unbridled joy that a third child was on the way, such evidence would be irrelevant to her state of mind on November 1 and of no use to Ms. Akers at trial. But clearly, such evidence would be relevant. In closing argument, Ms. Akers would be able to argue that even if the jury were to find that the baby was born alive, her statements to her friend during the pregnancy showed she had no motive to kill the baby and bolstered the credibility of her post-delivery statements that, rightly or wrongly, she genuinely thought the baby was stillborn. If successful, such an argument could be the difference between a conviction for murder or involuntary manslaughter. For its part, the prosecution would be free to try to impeach the credibility of the defense witness and/or persuade the jury not to place any value on evidence that Ms. Akers had expressed happiness about being pregnant.

The Majority dismisses the relevance of this hypothetical as "simply inapposite to the evidence presented in this case and our analysis of the same." Maj. Op. at 43 n.26. That is generally true of most analogies by hypotheticals. But the Majority does not explain why its logic would not result in the exclusion of such evidence. In the hypothetical, Ms. Akers' expression of unbridled joy occurred at the same time as the internet research, thus under the Majority's reasoning, such evidence would not have been probative to show that Ms. Akers *lacked* "an intent to kill or harm a baby at delivery many months later." Maj. Op. at 34.

Here's another hypothetical—suppose that Mr. Akers was the one who took the baby from Ms. Akers immediately after birth, wrapped him in a towel, and stuffed the towel-wrapped baby into a plastic bag, and that he, not Ms. Akers, was charged with murder. Also suppose that Mr. Akers was the one who did the internet research on terminating pregnancies, but that all the other evidence remained the same. Under the Majority's reasoning, Mr. Akers' research would be inadmissible even though it tends to show that, consistent with all the other evidence, Mr. Akers did not want another child—

of relevance under Rule 5-401.[9] *See, e.g.*, *Wallace*, 475 Md. at 672 (holding that evidence that the defendant slashed the victim's tire several years before the alleged attempted murder was relevant because it went to motive); *Snyder*, 361 Md. at 605 ("Evidence of previous quarrels and difficulties between a victim and a defendant is generally admissible to show motive.").

---

which is a motive to kill the child if it is born alive. It is difficult to fathom such a result, yet that's where the Majority's reasoning would take us, as the Majority concedes. *See id.* at 43 n.26.

[9] The motive of not wanting another child is, according to the Majority, a "general" motive, and that even if the abortion evidence was "material to a general motive—that Ms. Akers was less likely to want a child—the evidence clearly fails the probative value prong" because such evidence "does not increase the likelihood that she would be motivated to kill or harm a child or even simply to not have a plan for the baby at delivery." Maj. Op. at 37-38 n.23. Again, the Majority is looking at the disputed abortion evidence in isolation and demanding that, to be probative, the evidence must have a predictive quality to it; here, that conducting research on abortions would make it more probable that Ms. Akers would be motivated to kill the baby. But that's not the only way to assess relevance. Here, the disputed abortion evidence is just one piece of evidence that Ms. Akers did not want another child. Standing alone, does it prove that, on November 1, Ms. Akers did not want another child? Of course not, but that's not the test. Applying the correct test, when combined with all the other abortion evidence that was admitted *without objection*, the disputed abortion evidence tends to make it more likely that for the *entire* duration of the pregnancy, Ms. Akers did not want another child. Not wanting another child, combined with the perceived unavailability of an abortion, is a motive to kill a baby. Whether the totality of the evidence established that her desire not to have another child was so intense that it motivated her to kill the child was for the jury to decide. The disputed evidence was one small piece of the evidentiary puzzle.

Here's another hypothetical to demonstrate that a piece of evidence need not have a predictive quality to be relevant under Rule 5-401. We can all agree that wearing a red shirt does not increase the likelihood that one will rob a bank. But if there is evidence that the bank robber was wearing a red shirt during the crime, the fact that the defendant was wearing a red shirt on the day in question makes it more likely that he was the bank robber. Thus, evidence that the defendant was wearing a red shirt would be admissible even though it has no predictive quality.

15

*McCormick*'s second way of thinking about probative value, therefore, applies here. We start from the premise that the hypothesis is true (because that's what the jury found) and ask whether a mother who immediately kills her baby upon its birth is more likely to have a stronger and more consistent desire not to have another child than a woman who does not kill her child. In my view, the answer is clearly yes. So, then the question becomes: Is a woman who has a strong and consistent desire not to have another child more likely to have researched, considered, and desired that the pregnancy be terminated than a woman who does not have a strong and consistent desire not to have another child? Again, the answer is clearly yes. Thus, the evidence that Ms. Akers researched abortions on the internet, considered having an abortion, and in fact decided with her husband that she would get an abortion, was probative to whether she had a strong and consistent desire not to have another child, which, in turn, was probative of whether she had a motive to kill her baby upon its birth. Thus, the disputed abortion evidence is probative under *McCormick*'s second test.[10]

---

[10] This Court in recent years has applied a de novo standard of review for relevance determinations, *see Montague v. State*, 471 Md. 657, 673 (2020) (internal quotations omitted) (quoting *Portillo Funes v. State*, 469 Md. 438, 478 (2020)); *State v. Robertson*, 463 Md. 342, 352-53 (2019); *Ford v. State*, 462 Md. 3, 46 (2018), and the Majority applies that standard of review here.

It is worth observing that it was not always this way. From at least the early twentieth century to as recently as 2011, this Court reviewed relevance determinations for an abuse of discretion. *See, e.g.*, *Smith v. State*, 423 Md. 573, 592 (2011); *Brown v. Daniel Realty Co.*, 409 Md. 565, 601 (2009); *Young v. State*, 370 Md. 686, 720 (2002); *Merzbacher v. State*, 346 Md. 391, 404-05 (1997); *Thomas v. State*, 301 Md. 294, 317 (1984); *Durkin v. State*, 284 Md. 445, 453 (1979); *City of Baltimore v. State Roads Comm'n*, 232 Md. 145, 151 (1963); *Reid v. Humphreys*, 210 Md. 178, 185 (1956); *Bevans v. State*, 180 Md. 443, 446-47 (1942); *Md. Electric Rys. Co. v. Beasley*, 117 Md. 270

(1912). *McCormick*, on which this Court has repeatedly relied, *see, e.g.*, *Smith*, 423 Md. at 590-91; *State v. Joynes*, 314 Md. 113, 119-20 (1988); *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 601 (1985), likewise states that relevance determinations are discretionary, 1 *McCormick on Evidence* § 185 (8th ed. 2022).

That this Court long applied an abuse of discretion standard to relevance determinations should not come as a surprise, as that is the standard applied by federal courts to relevance rulings under Rule 401 of the Federal Rules of Evidence. *See, e.g.*, *United States v. Parker*, 262 F.3d 415, 420 (4th Cir. 2001); *United States v. Rathbun*, 98 F.4th 40, 51 (1st Cir. 2024); *United States v. Johnson*, 916 F.3d 579, 588 (7th Cir. 2019); *Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196, 1202 (10th Cir. 2012). Maryland Rule 5-401 is derived from and largely mirrors its federal counterpart. "When the words of a Maryland rule and federal rule are the same or similar, often we look to interpretations of the federal rule in construing the Maryland Rule." *Stoddard v. State*, 389 Md. 681, 695 (2005).

Thus, it should come as a surprise, at least in retrospect, that in 2008, we stated in *DeLeon v. State* that "[t]he determination of whether evidence is relevant is a matter of law, to be reviewed *de novo* by an appellate court." 407 Md. 16, 20 (2008). That statement was dicta, because we did not reach the relevance issue, having found that the petitioner waived it. *Id.* at 26, 33. Moreover, the sole citation in support of this proposition was *J.L. Matthews, Inc. v. Maryland-National Capital Park and Planning Commission*, where we stated that "when the trial judge's ruling [on the admissibility of evidence] involves a legal question, we review the trial court's ruling *de novo*." 368 Md. 71, 92 (2002). In *J.L. Matthews*, we simply recognized that a trial court's determination of *admissibility* can involve legal questions, and that in that context, we would not apply the usual abuse of discretion review. *Id.* There, because the relevance of the evidence at issue turned on the proper scope of a condemnation proceeding—a legal question—we reviewed the trial court's exclusion of the evidence de novo. *Id.* at 93. But we said nothing about the standard of review of a relevance determination under Rule 5-401, which is not surprising, because it was not even before the Court. So, in addition to being dicta, our statement in *DeLeon* rested on shaky ground.

Which is presumably why, notwithstanding our statement in *DeLeon*, we continued to review relevance determinations for an abuse of discretion for three more years. *See, e.g., Smith*, 423 Md. at 592; *Brown*, 409 Md. at 601. Then, in 2011, in *Ruffin Hotel Corporation of Maryland, Inc. v. Gasper*, out of nowhere, we adopted a bifurcated standard of review. Under that standard, the probative prong of the relevance test was reviewed for abuse of discretion, and the materiality prong was reviewed de novo. 418 Md. 594, 619-20 (2011); *see also State v. Simms*, 420 Md. 705, 724-25 (2011); *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 406 (2012).

This detour lasted about five years. In 2016, we abandoned the bifurcated approach in favor of a de novo standard of review, *Perry v. Asphalt & Concrete Services, Inc.*, 447 Md. 31, 48 (2016), which we have applied ever since.

17

The metamorphosis from abuse of discretion to bifurcated to de novo happened incrementally over time. Uncharacteristically, we never acknowledged the changes or subjected them to a stare decisis analysis. This was true even in *Williams v. State*, the case on which Justice Watts relies in her concurrence for the proposition that "[t]he conclusion [that the standard of review is de novo] was not one that was reached casually." Concurring Op. of Watts, J. at 2 (citing *Williams v. State*, 457 Md. 551 (2018)). Justice Watts correctly observes that we revised our opinion in *Williams* to clarify that a de novo standard applied to relevance determinations. *Id.* at 2-3 (quoting *Williams*, 457 Md. at 562-63). But in doing so, we neither acknowledged nor explained the evolution from abuse of discretion to de novo that had already occurred. *Williams* cited to nine cases in support of its (noncontroversial) assertion that interpretations of the Maryland Rules present questions of law that are reviewed de novo, *id.* at 562, which is different from the review of a relevance determination under Rule 5-401. For the latter proposition, *Williams* pointed only to *Fuentes v. State*, which relied on the same misinterpretation of *J.L. Matthews* that we made in *DeLeon*. *Williams*, 454 Md. at 564 (citing *Fuentes v. State*, 454 Md. 296, 325 n.13 (2017)).

There are legitimate arguments supporting all three of the standards of review this Court has applied to relevance determinations over the years. And the Majority is correct that neither side has asked this Court to resolve the tension in our case law on this issue. Because the Majority concludes that the disputed evidence fails both the probative and materiality tests under the most deferential standard—abuse of discretion—I agree that the Court doesn't need to resolve that issue now.

That said, the trial court's admission of the disputed evidence should undoubtedly survive review under the abuse of discretion standard.

> This Court has frequently described an abuse of discretion as occurring when "no reasonable person would take the view adopted by the circuit court" or when a decision is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable."

*Abruquah v. State*, 483 Md. 637, 652 n.5 (2023) (citations omitted).

In my view, it cannot be fairly said that the trial court's finding of relevance meets this standard. In concluding otherwise, the Majority does not grapple with the precise argument I make here, which can be boiled down to this: (1) motive is relevant in a murder case; (2) not wanting a third child is a motive to murder a newborn baby; therefore (3) evidence that Ms. Akers did not want a third child from the beginning of the pregnancy to the moment of birth, combined with evidence that Ms. Akers had a desperate desire to keep her pregnancy secret, tends to make it more likely that Ms. Akers had a motive to kill her newborn baby than without such evidence. The Majority does not poke holes in this reasoning, but instead holds steadfast to its view that to pass the relevance test, the disputed

18

D

Even if the abortion evidence was erroneously admitted, that error should not be reversible. Under Rule 5-103(a), "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling[.]" This Court has equated the concept of prejudice as used in this rule with a harmless error analysis. *Lamalfa v. Hearn*, 457 Md. 350, 372-73 (2018); *Perry v. Asphalt & Concrete Servs., Inc.*, 447 Md. 31, 59 (2016). Here, the Majority refuses to conduct a harmless error analysis because, it says, the State did not file a cross-petition on that issue. That excuse rings hollow. The State was not required to raise either the prejudice issue or harmless error in a cross-petition. *See* Md. R. 8-131(b)(1) ("Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Supreme Court may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or in a cross-petition."). And here, the Appellate Court did not reach the issue, thus the State had no

---

evidence, standing alone, must provide a motive for Ms. Akers to kill her newborn baby. Viewing evidence in isolation runs contrary to Maryland's heretofore settled approach to relevance determinations. *Snyder*, 361 Md. at 591; *Spector*, 289 Md. at 434.

At a bare minimum, then, reasonable minds can differ, in which case, the trial court's ruling here should survive review under an abuse of discretion standard. Had my view been adopted by the Majority, I would have supported a request for additional briefing to address the proper standard of review for relevance determinations.

harmless error ruling for us to review. But the Majority's assertion to the contrary notwithstanding, the State *did* raise the issue in its brief in this Court.[11]

In any event, the evidence of the internet research was not prejudicial, and therefore was harmless, for two independent reasons.

*First*, other evidence showing that Ms. Akers considered but did not get an abortion was admitted without objection. This included evidence that Ms. Akers wanted to terminate the pregnancy, agreed with her husband that she would terminate the pregnancy, told her doctor that she wanted to terminate the pregnancy, told her husband that the pregnancy *had* terminated, and that she did not terminate the pregnancy because, by the time the pregnancy was confirmed, it was too late (or so she thought).

"This Court has long approved the proposition that we will not find reversible error on appeal when objectionable testimony is admitted if the essential contents of that objectionable testimony have already been established and presented to the jury *without objection* through the prior testimony of other witnesses." *Grandison v. State*, 341 Md. 175, 218-19 (1995). The Majority acknowledges that the other abortion evidence was admitted and was not contested on appeal and makes clear that its holding is limited to the evidence of the internet research.

*Second*, viewing all the abortion evidence in the factual context described above, Ms. Akers was not prejudiced by the admission of *any* of the abortion evidence. To the

---

[11] In its brief before this Court, the State, citing *Gross v. State*, 481 Md. 233, 270 (2022), asserts: "Finally, the fact that the jury acquitted Akers on the charge of first-degree murder suggests that jurors were not prejudiced by the evidence—they rejected the idea that she acted with premeditated intent to kill."

contrary, she would have been prejudiced if such evidence had been excluded. Again, the jury concluded that the baby was born alive and that Ms. Akers caused her baby's death. With those two findings in mind, the obvious question on every juror's mind would have likely been: Given that Ms. Akers did not want another child, why didn't she get an abortion? Without the evidence that Ms. Akers considered an abortion, the jury would have been completely misled—to Ms. Akers' detriment—about how and why she found herself in her predicament on November 1.

To see why the exclusion of the abortion evidence would have worked against Ms. Akers' interests, consider how the jury could have perceived the State's case if *all* abortion-related evidence had been excluded. Ms. Akers desperately did not want another child. Her husband likewise did not want another child. Ms. Akers lied to her husband that the pregnancy was ectopic and had terminated on its own. Ms. Akers refused to seek prenatal care out of concern that her secret would be discovered, and she hoped her pregnancy would just go away. Ms. Akers ruled out giving her baby up for adoption. Ms. Akers refused to get help when she went into labor and when her water broke, again out of fear that her secret would be revealed. Ms. Akers delivered her baby, alive, into the toilet. Ms. Akers did not check to see if the baby—which she referred to as "the thing"—was alive or even bother to see if the baby was a boy or a girl. Ms. Akers wrapped the baby in a towel, put him in a plastic bag, and hid him in a closet. When the paramedics arrived to help her, Ms. Akers did not tell them about the newborn baby in the closet. Ms. Akers continued to keep her husband in the dark, even after she was taken to the hospital.

Faced with such evidence, reasonable jurors would naturally wonder about the conspicuous absence of any evidence explaining why Ms. Akers did not take the safe and legal path of an abortion. The jury wouldn't have learned that she did, in fact, research, consider, and want to get an abortion, and that her husband wanted her to get an abortion as well. The jury wouldn't have known that she didn't get an abortion because, after visiting the doctor, she thought it was too late. And the jury would not have learned why she decided to lie to her husband, which flowed directly from their joint decision to get an abortion and her failure to do so.

In contrast, with the abortion evidence, the jury had a path to find that Ms. Akers was confused and misguided, and that she panicked when, to her surprise, the baby was born alive, but that she did not hatch a plan to murder her baby immediately after its birth. And given that the jury acquitted Ms. Akers of first-degree murder, it seems likely that the jury took that path.

In sum, the State's case without any abortion evidence would have been less truthful and far more damaging to Ms. Akers than it was with it. Even if we assume the admission of such evidence was erroneous, such error does not rise to the level of reversible error.

## II

### A

The Majority holds that "Ms. Akers' bare decision to forgo prenatal care was not probative of motive or an intent to kill or harm a live child." Maj. Op. at 1-2. The Majority explains that "[i]t is too ambiguous, speculative, and equivocal to infer that a woman who forgoes prenatal care while pregnant is more likely to kill or harm a live human being." *Id.*

22

at 46. Here again, the Majority makes the mistake of assessing the relevance of this evidence in isolation. This was *not* a "bare" decision to forgo prenatal care. There was nothing speculative, ambiguous, or equivocal about Ms. Akers' decision to forgo prenatal care. She told Detective Weigman that she did not get prenatal care because she wanted the pregnancy to go away, and she was concerned that getting prenatal care would let everyone know that she was pregnant.

The Majority explains that a woman has no statutory duty to obtain obstetrical care and that "a woman's forgoing of prenatal care is not a crime in Maryland." *Id.* at 44. The Majority finds "instructive" this Court's concern, expressed in *Kilmon v. State*, 394 Md. 168, 170 (2006), that applying Maryland's reckless endangerment statute to a pregnant woman "could quickly lead to the policing of pregnant women through the criminalization of a 'whole host of intentional and conceivably reckless activity' that could be considered harmful or reckless[.]" Maj. Op. at 45. The Majority explains that "the unfortunate reality is that forgoing obstetrical care is not uncommon" and that "[p]ersons of color, persons with low-income, and persons living in rural areas are more likely to lack access to obstetrical care." *Id.* And, the Majority adds that "[a] woman who does not obtain prenatal care may be the subject of improper gender stereotypes and implicit biases arising out of societal views on how a pregnant woman should act."[12] *Id.* at 46.

None of that is relevant to the Rule 5-401 issue before us. Ms. Akers was not charged with a crime for what she did or did not do *before* the delivery; she was criminally charged

---

[12] The Majority does not explain what this means, why this is so, or even why it matters in a Rule 5-401 relevance analysis.

for her conduct *after* the delivery. There is no evidence that Ms. Akers' failure to get prenatal care had anything to do with her race (she is white), income, implicit biases, societal expectations of pregnant women, or lack of access to medical care. Instead, it had everything to do with keeping her pregnancy secret and her hope that her pregnancy would go away. Acknowledging the obvious connection between these reasons and her actions on November 1 does not inch us closer to a dystopian world in which Big Brother will be watching, scrutinizing, and criminalizing the lifestyle or medical decisions of pregnant women in Maryland.

B

The Majority declines to address the State's point that the lack of prenatal care was made even more relevant given that Ms. Akers received prenatal care during her pregnancies with her two children. The Majority contends that the State failed to make this point at trial when it argued the motion to exclude such evidence and during its opening statement and closing argument. According to the Majority, the disparate treatment theory "made its debut in the Appellate Court's opinion." Maj. Op. at 44. The Majority's refusal to consider this rationale is misguided.

For starters, the Majority is wrong on the facts. In its closing argument, the State argued that "[s]he chose to have the baby at home instead of going to the hospital and getting care at the hospital as she did with her two other children that she gave birth to."

More importantly, as the *proponent* of the evidence at issue, the State was not required, for preservation purposes, to argue "disparate treatment" at trial or before the Appellate Court. At trial, not even the objecting party is required to provide the basis for

24

an objection *unless* requested by the court. Md. R. 5-103(a)(1) ("In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was requested by the court or required by rule[.]"). Indeed, trial courts often rule on objections, after hearing the objecting party's basis or explanation, without hearing from the proponent of the evidence.

Neither the Maryland Rules nor our case law require the proponent of evidence, when faced with a relevance objection at trial, to disclose every argument in favor of its admission, lest the argument be waived on appeal. One can only imagine the extent to which trials would be prolonged if such a rule existed: Every time a relevance objection is overruled, the proponent would have to interrupt the witness examination to proffer all the reasons why the court correctly overruled the objection.

Nor do the rules or our case law require that the proponent of evidence—to survive an appellate challenge to its admission—mention such evidence in closing argument, let alone explain every theory of relevance to the jury. Sometimes, the relevance of a piece of evidence is obvious, or, for strategic reasons, a party chooses to leave the jury to draw its own conclusions. This Court has never imposed a "use it or lose it" requirement in closing arguments to preserve a relevance argument on appeal. Nor should it.

In any event, the disparate treatment argument was not a new issue; at most, it was a new argument in favor of the same position—that the lack of prenatal care was relevant. *See Kopp v. Schrader*, 459 Md. 494, 512 n.12 (2018) (distinguishing "between the raising of a new *issue*, which *ordinarily* is not allowed, and the raising of an additional *argument* . . . in support or opposition to an issue that *was* raised, which is allowed"). The State

argued in the trial court and on appeal that the lack of prenatal care was relevant under Rule 5-401; the disparate treatment observation simply bolstered that argument by providing additional context against which the jury could assess Ms. Akers' decision to forgo prenatal care with *this* pregnancy.

III

For the foregoing reasons, the evidence that Ms. Akers considered an abortion and conducted internet research on abortions was relevant to her state of mind when, as the jury concluded, she caused the death of her newborn baby. So too is the evidence that Ms. Akers received no prenatal care. Because the Majority concluded that such evidence should have been excluded on relevance grounds, I respectfully dissent.

Justice Biran has authorized me to state that he joins in this dissent.